170 Cal.App.4th 797 (2009)
THE PEOPLE, Plaintiff and Respondent,
v.
STEVEN DANIEL FORCE, Defendant and Appellant.
No. G039186.
Court of Appeals of California, Fourth District, Division Three.
January 26, 2009.
*804 John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Peter Quon, Jr., Karl T. Terp and Bradley Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
RYLAARSDAM, J.
In 2000, the Orange County District Attorney filed a petition seeking to have defendant Steven Daniel Force, then a state prison inmate, committed to the State Department of Mental Health (department) *805 under the Sexually Violent Predator Act (Act). (Welf. & Inst. Code, § 6600 et seq.; all further statutory references are to this code unless otherwise indicated.) As a result of numerous continuances, a hearing on the petition did not begin until April 2007. The jury returned a finding that defendant is a sexually violent predator (SVP) as defined in the Act, and the trial court committed him for an indeterminate period pursuant to the amendments to the Act made by Proposition 83, known as The Sexual Predator Punishment and Control Act: Jessica's Law, a voter initiative enacted on November 7, 2006 (Proposition 83).
Defendant contends use of the Act, as amended, resulted in the violation of his state and federal constitutional rights concerning due process, ex post facto laws, and double jeopardy, and violated the principle against retroactive application of laws. He further argues the trial court erred by excluding evidence that would have allowed him to contest his 1985 sexual assault conviction, by amending the burden of proof instruction to eliminate the presumption that he was not a sexually violent predator, and by refusing to disclose juror information to support his motion for a new trial based on juror misconduct. Since all of his claims lack merit, we affirm the judgment.

FACTS
Defendant, 48 at the time of the hearing, testified he began masturbating in front of young girls when he was 11 years old. He also admitted to numerous incidents where he exposed himself to young girls and women and to masturbating with children nearby. After his last release from custody, defendant made audiotapes discussing child molestation and masturbating with the sound of children playing in the background.
Defendant's first molestation occurred in 1976, while he was still a minor. He grabbed a young girl, forced his penis between her legs, and masturbated while trying to reach into her pants. Defendant admitted molesting three other minors. After a second incident in 1980, where he attempted to have a minor orally copulate him, defendant pleaded guilty to a criminal charge and was hospitalized as a mentally disordered sex offender. The third and fourth admitted molestations involved his wife's cousins who occasionally stayed with them overnight.
In 1985, defendant also pleaded guilty to charges that resulted from his forcing a young girl to orally copulate him. At the SVP hearing, defendant denied committing this offense, claiming he only entered the guilty plea to avoid a potentially longer prison sentence. However, defendant acknowledged he twice admitted the 1985 conviction in 1989 when he entered guilty pleas to a felony indecent exposure charge and the molestations of his wife's cousins.
*806 Defendant admitted not participating in the sex offender program after his return to prison. He claimed a prior attorney advised against doing so, and he objected to the program's requirement that he admit to all of his prior criminal activity, including the 1985 offense. However, defendant did participate in an unofficial program operated by an Episcopal priest.
The prosecution introduced the testimony of two licensed psychologists, Dawn Starr and Gary Zinik, each of whom evaluated defendant several times between 2000 and 2007. Both opined defendant has a diagnosed mental disorder. Starr testified defendant "qualifies for three diagnoses," exhibitionism, voyeurism, and pedophilia with a sexual attraction to pubescent females. Zinik opined defendant "meets the diagnostic criteria for [a] pedophile.... [H]e has [an] enduring imprinted sexual interest in young girls."
Starr and Zinik also concluded there was a high risk defendant would engage in sexually violent predatory offenses if released into the community. In part, each witness cited defendant's high score on the Static-99, an actuarial tool that focuses on proven risk factors for reoffending. Zinik also cited defendant's "whole history," including his early onset of committing sex offenses, his aggressiveness in committing them, his attacks on strangers, plus the fact defendant repeatedly committed sex offenses even after being caught and receiving either treatment or punishment.
Defendant presented testimony from two psychologists, the priest who conducted his unofficial prison program, a half sibling, and an employee from Atascadero State Hospital. Only one of the psychologists evaluated defendant. He concluded defendant was neither a pedophile nor likely to reoffend if released into the community. The other psychologist generally criticized the diagnostic techniques employed by the prosecution's expert witnesses. The priest described defendant as an active and sincere participant in the program. The Atascadero employee testified that, while at that institution, defendant acted "normal" and "did what he was supposed to do." Defendant's half sister, who is unmarried and has no minor children, offered to allow him to live with her in Alaska if he was released from custody.

DISCUSSION

1. Introduction

(1) "The [Act] ... permits the involuntary civil commitment ... of persons who are found ... beyond a reasonable doubt [citation], to be `sexually violent predator[s]' [citation]." (People v. Williams (2003) 31 Cal.4th 757, 764 [3 Cal.Rptr.3d 684, 74 P.3d 779]; see also Cooley v. Superior Court *807 (2002) 29 Cal.4th 228, 235 [127 Cal.Rptr.2d 177, 57 P.3d 654].) A "`commitment proceeding'" under the Act has been defined as "`a special proceeding of a civil nature....'" (People v. Yartz (2005) 37 Cal.4th 529, 536-537 [36 Cal.Rptr.3d 328, 123 P.3d 604].)
Before its 2006 amendments, the Act defined an SVP as "a person who has been convicted of a sexually violent offense against two or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (Former § 6600, subd. (a)(1); Stats. 2000, ch. 643, § 51.) Although the 2006 amendments changed the definition to one "convicted of a sexually violent offense against one or more victims" (§ 6600, subd. (a)(1), italics added), the trial court instructed the jury using the former definition.
Before the 2006 amendments, the Act limited a commitment to two years. (Former § 6604.) The state could repeatedly renew the commitment for additional two-year periods by filing a new petition and presenting proof beyond a reasonable doubt the person remained an SVP. (Ibid.) However, the Act also "provide[d] two ways a defendant [could] obtain review of his or her current mental condition to determine if civil confinement is still necessary. Section 6608 permit[ted] a defendant to petition for conditional release to a community treatment program," and "section 6605 ... call[ed] for an annual review of a defendant's mental status that [might] lead to unconditional release." (People v. Cheek (2001) 25 Cal.4th 894, 898 [108 Cal.Rptr.2d 181, 24 P.3d 1204], fn. omitted.)
Both before and after the 2006 amendments, section 6605 required the department to conduct an annual "examination of [an SVP's] mental condition," and allow the committed person to "retain, or if he or she is indigent," to request "the court [to] appoint, a qualified expert or professional person to examine him or her" with "access to all records concerning the person." (§ 6605, subd. (a).) However, the 2006 amendments require the department to annually prepare and file in court a report "in the form of a declaration[,] ... prepared by a professionally qualified person," to "include consideration of whether the committed person currently meets the definition of a sexually violent predator and whether conditional release to a less restrictive alternative or an unconditional release is in the best interest of the person and conditions can be imposed that would adequately protect the community." (Ibid.)
Formerly, section 6605 required the department to "provide the committed person with an annual written notice of his or her right to petition the court for conditional release under Section 6608" and, if the committed person *808 "[did] not affirmatively waive his or her right to [so] petition," obligated "the court [to] set a show cause hearing to determine whether facts exist that warrant a hearing on whether the person's condition has so changed that he or she would not be a danger to the health and safety of others if discharged." (Former § 6605, subd. (b).) In the event the court found probable cause of a change, it was obligated to set a hearing where the committed person would be "entitled to the benefit of all constitutional protections that were afforded to him or her at the initial commitment proceeding," including imposition of "[t]he burden of proof ... on the state to prove beyond a reasonable doubt that [his or her] diagnosed mental disorder remains such that he or she is a danger to the health and safety of others and is likely to engage in sexually violent criminal behavior if discharged." (Former § 6605, subds. (c), (d).)
As amended, section 6605 also declares, "If the Department ... determines that either: (1) the person's condition has so changed that the person no longer meets the definition of a sexually violent predator, or (2) conditional release to a less restrictive alternative is in the best interest of the person and conditions can be imposed that adequately protect the community, the director shall authorize the person to petition the court for conditional release to a less restrictive alternative or for an unconditional discharge.... The court, upon receipt of the petition[,] ... shall order a show cause hearing," and if it "determines that probable cause exists to believe that the committed person's diagnosed mental disorder has so changed," it must set a hearing carrying all of the procedural protections described above. (§ 6605, subds. (b)-(d).)
(2) Section 6608 remains largely unchanged by the 2006 amendments. It recognizes the right of a "person who has been committed as a sexually violent predator [to] petition[] the court for conditional release or an unconditional discharge without the recommendation or concurrence of the Director of Mental Health" (§ 6608, subd. (a)), although a hearing on the petition cannot be held until the committed person has been confined for at least one year (§ 6608, subd. (c)).
(3) If the court does not find the petition to be frivolous (§ 6608, subd. (a)), it "shall hold a hearing to determine whether the person committed would be a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior due to his or her diagnosed mental disorder if under supervision and treatment in the community" (§ 6608, subd. (d)). In the event "the court ... determines [he or she] would not be a danger ... while under supervision and treatment in the community," it "shall order the committed person placed with an appropriate forensic conditional release program operated by the state for one year." (Ibid.) Even where "the court rules against the committed person at [a] trial *809 for unconditional release from commitment, [it] may place the committed person on outpatient status...." (§ 6608, subd. (g).) If the court places the committed person in a conditional release program, "[a]t the end of one year, [it] shall hold a hearing to determine if the person should be unconditionally released from commitment...." (§ 6608, subd. (d).) Section 6608 further provides that "[i]n any hearing authorized by this section, the petitioner shall have the burden of proof by a preponderance of the evidence." (§ 6608, subd. (i).)

2. Due Process

Defendant contends the 2006 amendments replacing the two-year limit on confinement with an indeterminate term plus the shifting of the burdens of proof to him under sections 6605 and 6608 violate his right to due process of law, arguing "a person, once committed, can be held for the rest of his life without any requirement that the state prove that he remains mentally ill and dangerous." We disagree.
(4) "[F]reedom from physical restraint `has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action,' [citation]...." (Kansas v. Hendricks (1997) 521 U.S. 346, 356 [138 L.Ed.2d 501, 117 S.Ct. 2072].) But, as defendant acknowledges, both the United States Supreme Court and the California Supreme Court have recognized "that, consistent with `substantive' due process requirements, the state may involuntarily commit persons who, as the result of mental impairment, are unable to care for themselves or are dangerous to others," because "[u]nder these circumstances, the state's interest in providing treatment and protecting the public prevails over the individual's interest in being free from compulsory confinement. [Citations.]" (Hubbart v. Superior Court (1999) 19 Cal.4th 1138, 1151 [81 Cal.Rptr.2d 492, 969 P.2d 584]; see also Kansas v. Hendricks, supra, 521 U.S. at p. 358 ["We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a `mental illness' or `mental abnormality'" because the "added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control"].)
As for the potential length of defendant's commitment, neither Hubbart, which upheld the constitutionality of the original Act, nor Hendricks, which rejected a federal due process challenge to a similar Kansas statutory procedure, relied on the length of a sexually violent predator's commitment as the basis for declaring these laws satisfy substantive due process. In fact, the Kansas law called for commitment of a person found to be a sexually violent predator "until such time as the person's mental abnormality or *810 personality disorder has so changed that the person is safe to be at large." (Kan. Stat. Ann. § 59-29a07(a).) Section 2 of Proposition 83, which set forth the ballot initiative's findings and declarations of intent, recognized "California [was] the only state, of the number of states that have enacted laws allowing involuntary civil commitments for persons identified as sexually violent predators, which does not provide for indeterminate commitments." (Historical and Statutory Notes, 47C West's Ann. Pen. Code (2008 ed.) foll. § 209, p. 53; Prop. 83, § 2, subd. (k).)
(5) Also, contrary to defendant's suggestion, an indeterminate term will not result in a committed person lingering in confinement for a lifetime. Under the amended statute, the department is not only charged with annually reviewing a committed person's condition, but it must also have a qualified professional prepare a report, in the form of a declaration, and file it with the court that issued the commitment order. (§ 6605, subd. (a).) This report must consider whether the committed person "currently meets the definition of a sexually violent predator and whether conditional release to a less restrictive alternative or an unconditional release is in the best interest of the person and conditions can be imposed that would adequately protect the community." (Ibid.) If the department determines either of the foregoing conditions exists, it must authorize the committed person to file a petition for conditional or unconditional release (§ 6605, subd. (b)), and when the department "has reason to believe that a person committed to it ... is no longer a sexually violent predator, it shall seek judicial review of the person's commitment pursuant to the procedures set forth in Section 7250 in the superior court from which the commitment was made" (§ 6605, subd. (f)).
Defendant argues the amended Act violates his right to substantive due process because it imposes on a committed person the burden of proof at the initial probable cause hearing under section 6605 and at all of the hearings authorized by section 6608. But his narrow focus on the Act's evidentiary burdens ignores the ameliorating aspects just discussed, including the requirement the department conduct an annual review of a committed person and file and serve a report signed under penalty of perjury by a qualified individual. (§ 6605, subd. (a).) In addition, if the department determines there has been a sufficient change in the person's condition, it must authorize him to petition for conditional release or unconditional discharge. (§ 6605, subd. (b).)
(6) Defendant claims the amended Act imposes on him the burden of establishing probable cause to obtain a full hearing on the petition. Even if true, he concedes the burden so imposed is a rather low one; "a determination of probable cause by a superior court judge under the [Act] entails a decision whether a reasonable person could entertain a strong suspicion that the offender is a[ sexually violent predator]." (Cooley v. Superior Court, supra, 29 *811 Cal.4th at p. 252.) Since the department's annual report must be in the form of a declaration signed under penalty of perjury by one qualified to make findings on a committed person's current mental condition and potential dangerousness, in practically all cases the report alone would probably be sufficient to satisfy a finding in the committed person's favor.
(7) Under section 6608, when the department finds a committed person continues to meet the definition of a sexually violent predator or recommends against granting the person conditional release to a less restrictive placement, the committed person may still petition for release but bears the burden of establishing his or her right to relief by a preponderance of the evidence. (§ 6608, subd. (i).) Case law supports a conclusion that placing this burden on a person found to be a sexually violent predator is constitutionally permissible.
In People v. Sword (1994) 29 Cal.App.4th 614 [34 Cal.Rptr.2d 810], the court rejected a due process challenge to the imposition of the burden of proof on a defendant found not guilty by reason of insanity to establish his entitlement to be released from confinement on outpatient status. (Pen. Code, § 1026.2.) "[T]he fact of the criminal conviction provides a basis for inferring that defendant is both mentally ill and dangerous, and may therefore be committed," and "there is [also] a presumption of continued insanity...." (People v. Sword, supra, 29 Cal.App.4th at p. 624.) Other courts have reached the same result in similar circumstances. (See Jones v. United States (1983) 463 U.S. 354, 364, 366 [77 L.Ed.2d 694, 103 S.Ct. 3043] ["The fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness" and "[i]t comports with common sense to conclude that someone whose mental illness was sufficient to lead him to commit a criminal act is likely to remain ill and in need of treatment"]; People v. Beck (1996) 47 Cal.App.4th 1676, 1684 [55 Cal.Rptr.2d 340] ["an acquittal by reason of insanity entails a finding that the defendant in fact committed a criminal offense," and "commission of the crime in turn supports an inference of potential dangerousness and possible continuing mental illness ... which justifies the state in exercising great care in evaluating the offender prior to release into the community" (citation omitted)].)
Here, the state has established defendant is an SVP by proof beyond a reasonable doubt. As noted, the department's annual report must be prepared by a person qualified to determine a committed person's current mental condition and potential for conditional release and signed under penalty of perjury. Thus, where the department concludes these two conditions have not changed, imposing on a committed individual the burden of showing otherwise is not a constitutionally impermissible burden.
*812 Defendant relies on Foucha v. Louisiana (1992) 504 U.S. 71 [118 L.Ed.2d 437, 112 S.Ct. 1780], but that case is clearly distinguishable. Foucha was committed to a mental institution after being found not guilty of criminal offenses by reason of insanity. Several years later, the institution's superintendent recommended Foucha's release and a panel reported there was no evidence he suffered from a mental illness. Nonetheless, the state court ordered Foucha to remain confined because he failed to carry his burden of showing he was no longer dangerous.
The Supreme Court held the procedure violated Foucha's rights. "Under the state statute, Foucha is not now entitled to an adversary hearing at which the State must prove by clear and convincing evidence that he is demonstrably dangerous to the community. Indeed, the State need prove nothing to justify continued detention, for the statute places the burden on the detainee to prove that he is not dangerous. At the hearing which ended with Foucha's recommittal, no doctor or any other person testified positively that in his opinion Foucha would be a danger to the community, let alone gave the basis for such an opinion. There was only a description of Foucha's behavior ... and his antisocial personality, along with a refusal to certify that he would not be dangerous.... This, under the Louisiana statute, was enough to defeat Foucha's interest in physical liberty. It is not enough to defeat Foucha's liberty interest under the Constitution in being freed from indefinite confinement in a mental facility." (Foucha v. Louisiana, supra, 504 U.S. at pp. 81-82.)
(8) Under the Act, the circumstance presented in Foucha could not arise. Section 6605 declares that if the department concludes in its annual report that defendant is no longer an SVP or that he is amenable to less restrictive confinement, it must not only allow him to file a petition for his release, but if defendant satisfies the minimal probable cause burden of proof at the probable cause hearing, he would be entitled to a full hearing at which the state would have to shoulder the burden of establishing his continued SVP status and dangerousness by proof beyond a reasonable doubt. Even if the department issues a report adverse to defendant, he can still petition for release and, if he shows otherwise by a preponderance of the evidence, he is entitled to relief. Thus, Foucha does not control here.

3. Ex Post Facto/Double Jeopardy

Claiming "[t]he amendments to the ... Act were part of [Proposition 83,] an initiative aimed at increasing punishment for sexual offenders," and that, as amended, "[t]he state is no longer obligated to prove, beyond a reasonable doubt, every two years ... [he] is dangerous and mentally impaired," defendant argues "[t]he new law has eliminated many of the protections and *813 procedures that permitted both the United States Supreme Court and the California Supreme Court to determine that SVP laws are ... civil laws," and "[a]bsent those procedures and protections ... has turned this procedure into a criminal penalty." Thus, since he "already has been punished for the crimes underlying his commitment," defendant claims, the amended Act violates the federal and state constitutional protections against double jeopardy and ex post facto laws. Again, we conclude defendant is wrong.
(9) "The federal and state ex post facto clauses are interpreted identically. [Citation.]" (Hubbart v. Superior Court, supra, 19 Cal.4th at p. 1171.) "[T]he ban on ex post facto legislation is narrow in scope," prohibiting "only those laws which `retroactively alter the definition of crimes or increase the punishment for criminal acts.' [Citations.] The basic purpose of the clause is to ensure fair warning of the consequences of violating penal statutes, and to reduce the potential for vindictive legislation. [Citation.]" (Id. at pp. 1170-1171.) (10) In addition, both the federal constitution's and state constitution's double jeopardy clauses "protect[] only against the imposition of multiple criminal punishments for the same offense...." (Hudson v. United States (1997) 522 U.S. 93, 99 [139 L.Ed.2d 450, 118 S.Ct. 488]; People v. Superior Court (Williams) (1991) 233 Cal.App.3d 477, 484 [284 Cal.Rptr. 601] ["Double jeopardy applies to criminal prosecutions and is not applicable to civil proceedings."].)
(11) Kansas v. Hendricks, supra, 521 U.S. 346 rejected a claim that Kansas's SVP law violated the federal constitution's ex post facto and double jeopardy clauses, finding the law did not inflict punishment even though persons confined under it could be held for an indeterminate period. Initially the high court noted, "The categorization of a particular proceeding as civil or criminal `is first of all a question of statutory construction,'" and if "the legislature meant the statute to establish `civil' proceedings," the court would "ordinarily defer to the legislature's stated intent." (Id. at p. 361.) However the court "recognize[d] that a `civil label is not always dispositive,'" and "a party challenging the statute" can overcome a "civil" label by "provid[ing] `the clearest proof' that `the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention' to deem it `civil[,]' [citation]." (Ibid.)
Nonetheless, the high court concluded Kansas's law was civil in nature for the following reasons: (1) "commitment under the Act does not implicate either of the two primary objectives of criminal punishment: retribution or deterrence" (Kansas v. Hendricks, supra, 521 U.S. at pp. 361-362); (2) "unlike a criminal statute, no finding of scienter is required to commit an individual who is found to be a sexually violent predator" (id. at p. 362); (3) "persons committed under the Act are, by definition, suffering from *814 a ... `... disorder' that prevents them from exercising adequate control over their behavior," and it could not "be said that the legislature intended the Act to function as a deterrent" because "[s]uch persons are ... unlikely to be deterred by the threat of confinement" (id. at pp. 362-363); (4) since "measures to restrict the freedom of the dangerously mentally ill" constitute "a legitimate nonpunitive governmental objective," merely because "the civil commitment scheme at issue ... involve[s] an affirmative restraint ... `does not inexorably lead to the conclusion that the government has imposed punishment'" (id. at p. 363); (5) the law's use of "`some ... safeguards applicable in criminal trials'" reflects an intent "to confine only a narrow class of particularly dangerous individuals," rather than to "`turn the[] proceedings into criminal prosecutions'" (id. at p. 364); and (6) even if the law "fails to offer any legitimate `treatment,'" "under the appropriate circumstances and when accompanied by proper procedures, incapacitation may be a legitimate end of the civil law," at least where it "is coupled with the State's ancillary goal of providing treatment to those offenders, if such is possible" (id. at pp. 365-366).
(12) Following Hendricks, the California Supreme Court found the original Act civil in nature. "[T]he [Act] cannot be meaningfully distinguished for ex post facto purposes from the Kansas scheme...." (Hubbart v. Superior Court, supra, 19 Cal.4th at p. 1175; see also People v. Yartz, supra, 37 Cal.4th at p. 536 ["`an SVPA commitment proceeding is a special proceeding of a civil nature'"].) Concerning the length of an individual's commitment in particular, Hubbart noted, "nothing in Hendricks purports to limit for ex post facto purposes the precise length of time during which dangerously disordered persons may be confined, or the particular procedural circumstances under which they may be released. In rejecting Hendricks's claim that the scheme imposed punishment because confinement was `potentially indefinite,' the court made clear that the critical factor is whether the duration of confinement is `linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others.' [Citation.]" (Hubbart v. Superior Court, supra, 19 Cal.4th at p. 1176.)
Defendant notes several provisions of Proposition 83 increased the punishment imposed on sexual offenders under California's penal laws. But as for Proposition 83's amendment of the Act, "The statement[] of intent ... expressly set[] forth the intent to strengthen SVP confinement laws...." (People v. Shields (2007) 155 Cal.App.4th 559, 564 [65 Cal.Rptr.3d 922] [rejecting claim 2006 amendment eliminated trial court's jurisdiction to recommit person previously committed as SVP].)
Section 2, subdivision (k) of the initiative, discussing the intent behind the amendments to the Act, reflects the amendments are not punitive in nature. *815 "California is the only state, of the number of states that have enacted laws allowing involuntary civil commitments for persons identified as sexually violent predators, which does not provide for indeterminate commitments. California automatically allows for a jury trial every two years irrespective of whether there is any evidence to suggest or prove that the committed person is no longer a sexually violent predator. As such, this act allows California to protect the civil rights of those persons committed as a sexually violent predator while at the same time protect society and the system from unnecessary or frivolous jury trial actions where there is no competent evidence to suggest a change in the committed person." (Historical and Statutory Notes, 47C West's Ann. Pen. Code (2008 ed.) foll. § 209, p. 53.)
(13) This finding reflects the purpose behind the Act's indeterminate term and other procedural amendments concerning review and reporting on a committed person's condition was to ensure "the confinement's duration is ... linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others. [Citation.]" (Kansas v. Hendricks, supra, 521 U.S. at p. 363.) Given this expressed intent, the changes to the Act discussed in greater detail above, plus the holdings in both Hendricks and Hubbart, we conclude application of the amended Act to defendant does not violate his constitutional protections from ex post facto laws and being placed more than once in jeopardy for the same crime.

4. Retroactive Application of Revised Law

As noted, plaintiff filed the petition to commit defendant as an SVP in 2000. For reasons not relevant here, a hearing on the petition was delayed until 2007. In 2006, plaintiff filed and served on defendant a notice that, due to recent amendments, it would be seeking to commit him "for an indeterminate term." After the jury returned its finding, the trial court imposed an indeterminate commitment. Defendant contends that the amended Act is prospective in application and thus imposition of an indeterminate commitment on him constitutes an invalid retroactive application of the amended law.
This argument was recently considered and rejected in People v. Carroll (2007) 158 Cal.App.4th 503 [69 Cal.Rptr.3d 816] and Bourquez v. Superior Court (2007) 156 Cal.App.4th 1275 [68 Cal.Rptr.3d 142]. We find their analysis of this issue persuasive.
(14) Both Carroll and Bourquez acknowledge defendant's point that "[a] new or amended statute is presumed to operate prospectively only, unless there is an express declaration or clear indication the Legislature (or the *816 electorate) intended otherwise. [Citations.]" (People v. Carroll, supra, 158 Cal.App.4th at p. 513; see also Bourquez v. Superior Court, supra, 156 Cal.App.4th at p. 1288.) (15) In addition, Bourquez noted "Proposition 83 is entirely silent on the question of retroactivity, so we presume it is intended to operate only prospectively." (Bourquez v. Superior Court, supra, 156 Cal.App.4th at p. 1288.)
(16) Nonetheless each case recognized a law retroactively applies "`only if it attaches new legal consequences to, or increases a party's liability for, an event, transaction, or conduct that was completed before the law's effective date. [Citations.] Thus, the critical question for determining retroactivity usually is whether the last act or event necessary to trigger application of the statute occurred before or after the statute's effective date. [Citations.]'" (Bourquez v. Superior Court, supra, 156 Cal.App.4th at p. 1288; see also People v. Carroll, supra, 158 Cal.App.4th at p. 513.) They also cite the corollary principle that "`[a] law is not retroactive "merely because some of the facts or conditions upon which its application depends came into existence prior to its enactment." [Citation.]' [Citation.]" (Bourquez v. Superior Court, supra, 156 Cal.App.4th at pp. 1288-1289; People v. Carroll, supra, 158 Cal.App.4th at p. 513.)
(17) Thus, as applied here: "In determining whether someone is an SVP, the last event necessary is the person's mental state at the time of the commitment. For pending petitions, the person's mental state will be determined after the passage of Proposition 83, at the time of commitment. While past qualifying sex crimes are used as evidence in determining whether the person is an SVP, a person cannot be so adjudged `unless he "currently" suffers from a diagnosed mental disorder which prevents him from controlling sexually violent behavior, and which "makes" him dangerous and "likely" to reoffend. [Citation.]' [Citation.] `[T]he statute clearly requires the trier of fact to find that an SVP is dangerous at the time of commitment.' [Citation.] [¶] ... [¶] Because a proceeding ... under the [Act] focuses on the person's current mental state, applying the indeterminate term of commitment of Proposition 83 does not attach new legal consequences to conduct that was completed before the effective date of the law. [Citation.]" (Bourquez v. Superior Court, supra, 156 Cal.App.4th at p. 1289; see also People v. Carroll, supra, 158 Cal.App.4th at pp. 513-514.)
As Carroll held, "In light of the foregoing, the significant point with respect to retroactivity is not the filing of the petition, but trial and adjudication under the SVPA. [Citation.]" (People v. Carroll, supra, 158 Cal.App.4th at p. 514, fn. omitted.) For the same reasons, we conclude imposing an indeterminate term on defendant under the Act as amended in 2006 did not amount to a retroactive application of the law.

*817 5. Exclusion of Evidence

a. Background

Before the hearing, defendant announced his intent to call Dr. Elizabeth Loftus, an expert in the field of eyewitness identification, to "testify[] regarding the police reports" covering his 1985 conviction. Defendant conceded he was "not trying to repudiate the conviction," and Loftus "will not be opining that [he] did or did not do the crime." Rather, he claimed her testimony would be to "point out the various problems she sees with eye-witness identification," "educate the jury about eye-witness identification and highlight the questionable circumstances that she sees about the entire identification process."
At a pretrial hearing, the trial court acknowledged defendant's "right to explain ... to the jury in this case" that he "wasn't really guilty" but entered a guilty plea to the charge "for strategic reasons...." While deferring a final ruling on the admissibility of Dr. Loftus's testimony, the court cited Evidence Code section 352 and noted it was "disinclined to permit [her] to testify" because with it "we're going to get into a whole other trial...." There was no further attempt to introduce Dr. Loftus's testimony.
Subsequently, after respondent questioned defendant at length concerning the contents of the police reports covering the 1985 offense, defendant's attorney sought to introduce these documents. Again citing Evidence Code section 352, the court excluded the reports finding "the prejudicial impact ... in terms of setting up a whole other collateral mini trial on the defendant's guilt or innocence in 1985 outweighs the probative value since he pled guilty." On cross-examination, defendant's attorney also questioned him about what he described as "glaring errors" in the reports.

b. Analysis

Defendant now contends Dr. Loftus's testimony and the police reports constituted relevant evidence and the trial court's exclusions of them violated his constitutional rights by "den[ying him] his right to present a defense...." He further contends the trial court abused its discretion by relying on Evidence Code section 352, arguing the court found his guilty plea to the 1985 charge barred relitigation of that offense. The trial court properly limited the admission of evidence surrounding defendant's 1985 conviction.
(18) First, it is questionable whether defendant preserved his right to challenge the exclusion of Dr. Loftus's testimony. "`A party desiring to preserve for appeal a challenge to the admission of evidence must comply *818 with the provisions of Evidence Code section 353, which precludes reversal for erroneous admission of evidence unless: "There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated to make clear the specific ground of the objection or motion."' [Citation.] A properly directed motion in limine may satisfy the requirements of Evidence Code section 353 and preserve objections for appeal. [Citation.] However, the proponent must secure an express ruling from the court. [Citation.]" (People v. Ramos (1997) 15 Cal.4th 1133, 1171 [64 Cal.Rptr.2d 892, 938 P.2d 950].)
Here the trial court stated that, "[o]n [the] admissibility of Dr. Loftus, I think it's unlikely, but I will defer until I hear some more evidence. I do not want to hear anything about Dr. Loftus from either [party] ... unless or until we revisit the issue, and I'm not going to revisit Dr. Loftus unless one of you ... asks me to." Thus, while the judge found the admissibility of Dr. Loftus's testimony to be "unlikely," he was willing to "defer" a ruling "until [he] heard some more evidence." Apparently, defendant never broached the issue again.
(19) But even on the merits, defendant's argument fails. The trial court excluded Dr. Loftus's testimony on eyewitness identification and the police reports under Evidence Code section 352. That statute allows a court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review the trial court's ruling for abuse of discretion. (People v. Mungia (2008) 44 Cal.4th 1101, 1130 [81 Cal.Rptr.3d 614].)
Here the trial court allowed defendant to repeatedly deny committing the 1985 offense. Also, while it barred admission of the police reports, the court did permit both counsel to question defendant about the contents of those reports, even allowing defendant to point to what he described as "glaring errors" in them.
(20) Furthermore, under the circumstances of this case, the relevancy of Dr. Loftus's testimony and the police reports was minimal at best. Section 6600, subdivision (a)(1) requires proof that a person "has been convicted of a sexually violent offense" (italics added) to support a finding he or she is an SVP. Of course, mere proof that an individual suffered a criminal conviction would not alone suffice to support this element. (People v. Fulcher (2006) 136 Cal.App.4th 41, 50-51 [38 Cal.Rptr.3d 702] ["The ... Act requires not only evidence of one of the specified offenses qualifying as predicate acts ..., it also requires proof that the offense is a sexually violent offense."].) Consequently, the circumstances of the crime are relevant. (Id. at p. 51.) But *819 defendant's motion in limine acknowledged he was "not trying to repudiate [his] conviction" of a qualifying crime and conceded his plea "was made freely and voluntarily." Nor did his proffered evidence dispute the nature of the sexual assault on the victim.
Citing Teitelbaum Furs, Inc. v. Dominion Ins. Co. (1962) 58 Cal.2d 601 [25 Cal.Rptr. 559, 375 P.2d 439], defendant claims the trial court erred by relying on the fact of his prior conviction to exclude Loftus's testimony and police reports. Teitelbaum stated that although "[a] plea of guilty is admissible in a subsequent civil action," "[i]t would not serve the policy underlying collateral estoppel ... to make such a plea conclusive." (Id. at p. 605.) However Teitelbaum was decided before Boykin v. Alabama (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709] and In re Tahl (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449], which fundamentally altered the previous informal process by which a criminal defendant entered a guilty plea. When defendant pleaded guilty in 1985, he executed a two-page written document, under penalty of perjury, acknowledging each of the rights he was waiving by doing so, that he had an opportunity to discuss the matter with counsel, and reciting the following factual basis for his plea: "On August 10, 1985, ... I willfully committed a forcible lewd act upon the person of [K.M.]S., a child under 14; and further, said act involved ... forcible oral copulation...." Twice thereafter, when entering guilty pleas to the 1989 offenses, defendant again under penalty of perjury admitted this prior conviction.
In light of the evidence the trial court allowed concerning the 1985 offense, the nature of defendant's guilty plea and subsequent admissions of having suffered the conviction, plus the limited relevancy of the proffered evidence, the trial court properly exercised its discretionary authority to exclude Dr. Loftus's expert testimony and the police reports.

6. Modification of Jury Instructions

a. Background

Defendant proposed the jury instruction on plaintiff's burden of proof be modified to state, "Respondent in a [sexually violent predator] case is presumed to not be a sexually violent predator." The trial court rejected this request.
On the burden of proof, the court gave the following instruction: "The fact that a petition has been filed against the respondent is not evidence that the petition is true. You must not be biased against the respondent just because this petition has been filed or because this matter has been brought to trial. [¶] The petitioner must prove each element beyond a reasonable doubt. Whenever I tell you the petitioner must prove something, I mean they [sic] must *820 prove it beyond a reasonable doubt." After defining what constitutes proof beyond a reasonable doubt, the court instructed: "In deciding whether the petitioner has proved their [sic] case beyond a reasonable doubt, you must impartially compare and consider all of the evidence that was received throughout the entire trial.... [¶] ... [¶] Unless the evidence proves the petition true beyond a reasonable doubt, you must find the petition not to be true." The court instructed the jury on the elements necessary to find defendant is an SVP using CALCRIM No. 3454, which repeated the requirement that "[t]o prove this allegation, the petitioner must prove [the elements] beyond a reasonable doubt...."

b. Analysis

Defendant now contends the failure to instruct the jury to presume he was not an SVP violated his constitutional rights, repeating his claim the amended Act "is criminal, rather than civil, in nature...." Alternatively, defendant claims that "even if [the amended Act is] not criminal in nature, the scheme is close enough in implication and effect that the[] heightened protections mandated by the Due Process clause must apply." These contentions lack merit.
First, as noted above, the Act, even as amended in 2006, is not a criminal proceeding, but rather "`a special proceeding of a civil nature....'" (People v. Yartz, supra, 37 Cal.4th at pp. 536-537.)
(21) Second, as defendant concedes, even in the criminal context the failure to instruct a jury on the presumption of innocence does not constitute error, much less prejudicial error. "To be sure, we have said that `[t]he presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice.' [Citation.] The presumption operates at the guilt phase of a trial to remind the jury that the State has the burden of establishing every element of the offense beyond a reasonable doubt. [Citation.] But even at the guilt phase, the defendant is not entitled automatically to an instruction that he is presumed innocent of the charged offense. [Citation.] An instruction is constitutionally required only when, in light of the totality of the circumstances, there is a `"genuine danger"' that the jury will convict based on something other than the State's lawful evidence, proved beyond a reasonable doubt. [Citations.]" (Delo v. Lashley (1993) 507 U.S. 272, 278 [122 L.Ed.2d 620, 113 S.Ct. 1222]; see also Kentucky v. Whorton (1979) 441 U.S. 786, 789 [60 L.Ed.2d 640, 99 S.Ct. 2088] ["the failure to give a requested instruction on the presumption of innocence does not in and of itself violate the Constitution," but "must be evaluated in light of the totality of the circumstances"].)
*821 (22) Finally, in People v. Beeson (2002) 99 Cal.App.4th 1393 [122 Cal.Rptr.2d 384], involving a mentally disordered offender commitment proceeding, the court held "we cannot conclude that the federal and state Constitutions require a presumption-of-innocence-like instruction outside the context of a criminal case." (Id. at p. 1409.) Citing the principle that "[a] state's decision `to provide some of the safeguards applicable in criminal trials cannot itself turn these proceedings into criminal prosecutions requiring the full panoply of rights applicable there'" (id. at p. 1410, fn. omitted), Beeson noted "courts generally have refused to extend the presumption of innocence beyond the context of criminal or quasi-criminal proceedings" (ibid., fn. omitted). It also concluded "the layers of professional review and observation of the patient's condition, and the concern of family and friends" rendered "the risk of error ... in the context of a civil commitment hearing" "qualitatively different" than a criminal prosecution. (Ibid.)
Respondent presents no persuasive reason to reach a different result in this case. Thus, we conclude the trial court did not err by amending the standard instruction on reasonable doubt to eliminate the reference to a presumption of either innocence or that respondent was not an SVP.

7. Nondisclosure of Juror Information

a. Background

After the hearing the trial court issued an order sealing personal juror identifying information. Defendant then petitioned under Code of Civil Procedure sections 206, subdivision (g) and 237 to unseal juror information to support the filing of a motion for new trial. The prosecution opposed the motion.
Defense counsel submitted a declaration supporting the petition, citing comments made to her by members of the jury after trial that she claimed led her to "suspect[] there may have been juror misconduct...." The reasons cited by counsel were as follows: "[An] 83 year old male juror informed the jury that he was much older than [defendant] and ... still had a sex drive and that [defendant's] age was not a protective factor in sexual reoffense. [¶] ... [I]n the jury room [two female jurors said] they were married to older men and that both were still interested in sex.... [¶] Some jurors indicated that they thought there might be crimes committed by [defendant] ... they weren't allowed to know about.... [¶] There were two hold-out jurors. [¶] Both of these jurors said they changed their vote because of the pressure from the other jurors. [¶] As deliberations dragged on, jurors complained about hardships.... These comments were specifically aimed at certain jurors to force them to change their minds.... [¶] [One juror] said that she wanted *822 [counsel] to tell [defendant] that she would see him in heaven.... [¶] Two hold-out jurors told me that they were confused by the court's failure to answer their question about what would happen if they could not agree.... They said this affected their verdict. [¶] Jurors said that their criteria was that [defendant] hadn't changed, or hadn't shown that he would be safe, rather than putting the burden on the [state]. [¶] A number of jurors said that the standard they used was `better safe than sorry,' rather than beyond a reasonable doubt.... [¶] Some jurors indicated that the topic of `currently having a serious difficulty controlling behavior' was not discussed. [¶] Some jurors stated that there was no consideration of the aspect of `current' in the deliberations."
After a hearing, the trial court denied the juror information disclosure petition. It balanced the jurors' "privacy interests" against the "litigant's ... rights" and concluded defendant had failed to make a "prima facie showing which convinces the court that there is good cause ... the [jurors'] privacy shield should be pierced...." Defendant then moved for a new trial, in part arguing the jury committed misconduct by failing to apply the proper burden of proof. The trial court denied the motion.

b. Analysis

Assuming that the Act is civil in nature, defendant contends the trial court erred by sealing juror information after the hearing because the authority to do so is limited to criminal proceedings. (Code Civ. Proc., §§ 206, subd. (g) & 237, subd. (a)(2).) Alternatively defendant claims the trial court erred in denying the petition to disclose personal juror identifying information, arguing he "met his burden of establishing sufficient good cause demonstrating the necessity for the release of that information so that he could prepare his new trial motion."
(23) Whether the trial court erred in sealing personal juror identifying information presents an unanswered question. Code of Civil Procedure section 237, subdivision (a)(2) declares that "[u]pon the recording of a jury's verdict in a criminal jury proceeding, the court's record of personal juror identifying information of trial jurors, ... consisting of names, addresses, and telephone numbers, shall be sealed until further order of the court...." As noted above, case law has recognized a commitment proceeding under the Act is not a criminal proceeding. However, neither is it an ordinary civil proceeding. (People v. Yartz, supra, 37 Cal.4th at p. 536.)
(24) But, contrary to defendant's claim, even assuming the provisions of Code of Civil Procedure sections 206 and 237 applicable to criminal prosecutions also apply to commitment proceedings under the Act that does not *823 render this a criminal action. "The state's provision of procedural protections similar to those afforded criminal defendants `does not transform a civil commitment proceeding into a criminal prosecution.' [Citations.]" (People v. Allen (2008) 44 Cal.4th 843, 861 [80 Cal.Rptr.3d 183, 187 P.3d 1018], quoting Kansas v. Hendricks, supra, 521 U.S. at pp. 364-365.)
More importantly, even assuming the trial court erred by sealing personal juror identifying information, defendant has failed to establish it committed reversible error by denying his petition to unseal that information. Code of Civil Procedure section 206, subdivision (g) declares "a defendant ... may, following the recording of a jury's verdict in a criminal proceeding, petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose.... The court shall consider all requests for personal juror identifying information pursuant to Section 237."
The latter statute provides a "petition ... for access to ... records" of the jurors' personal identifying information "shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information. The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information, but shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure. A compelling interest includes, but is not limited to, protecting jurors from threats or danger of physical harm. If the court does not set the matter for hearing, the court shall by minute order set forth the reasons and make express findings either of a lack of a prima facie showing of good cause or the presence of a compelling interest against disclosure." (Code Civ. Proc., § 237, subd. (b).)
(25) Defendant relies on People v. Simms (1994) 24 Cal.App.4th 462 [29 Cal.Rptr.2d 436]. But that case has been disapproved by the Supreme Court. (See Townsel v. Superior Court (1999) 20 Cal.4th 1084, 1096, fn. 4 [86 Cal.Rptr.2d 602, 979 P.2d 963].) Under People v. Wilson (1996) 43 Cal.App.4th 839 [50 Cal.Rptr.2d 883], a request for disclosure of personal juror information requires a "timely" request that is "accompanied by a sufficient showing to support a reasonable belief jury misconduct occurred, diligent efforts were made to contact the jurors through other means, and ... further investigation was necessary to provide the court with adequate information to rule on a motion for new trial." (Id. at p. 850; see also People v. Rhodes (1989) 212 Cal.App.3d 541, 551-552 [261 Cal.Rptr. 1].) "Absent a satisfactory, preliminary showing of possible juror misconduct, the strong *824 public interests in the integrity of our jury system and a juror's right to privacy outweigh the countervailing public interest served by disclosure of the juror information as a matter of right in each case. This rule safeguards both juror privacy and the integrity of our jury process against unwarranted `fishing expeditions' by parties hoping to uncover information to invalidate the jury's verdict. At the same time, it protects a defendant's right to a verdict uninfluenced by prejudicial juror misconduct by permitting, upon a showing of good cause, access to juror information needed to investigate allegations of juror misconduct." (People v. Rhodes, supra, 212 Cal.App.3d at p. 552, fn. omitted.) "A failure to make this required showing justifie[s] denying the request for disclosure." (People v. Wilson, supra, 43 Cal.App.4th at p. 850.)
(26) Here, the sole basis for seeking personal juror information was comments made to defendant's trial counsel after the hearing that she claimed suggested the possibility juror misconduct occurred during deliberations. "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Evid. Code, § 1150, subd. (a).) Thus, the statute recognizes a "distinction between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved...." (People v. Hutchinson (1969) 71 Cal.2d 342, 349 [78 Cal.Rptr. 196, 455 P.2d 132].) "`This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent.' [Citations.]" (People v. Cox (1991) 53 Cal.3d 618, 694 [280 Cal.Rptr. 692, 809 P.2d 351].)
Much of the evidence cited by defense counsel in support of the juror information disclosure petition involves clearly inadmissible information. Counsel's declaration refers to posthearing comments that some jurors "thought" defendant committed other crimes not introduced during the hearing, another juror's comment to counsel, after the hearing, about seeing defendant in heaven, comments by other jurors about their "confusion" over the instructions or the "criteria" or "standard" they employed to reach decide the case, and posthearing statements about topics not expressly discussed during deliberations. These statements reflect either posthearing personal comments or "at most suggest `deliberative error' in the jury's collective mental process-confusion, misunderstanding, and misinterpretation of the law." (Ford v. Bennacka (1990) 226 Cal.App.3d 330, 336 [276 Cal.Rptr. 513]; see also Krouse v. Graham (1977) 19 Cal.3d 59, 81 [137 Cal.Rptr. 863, 562 P.2d 1022] ["An assertion that a juror privately `considered' a particular *825 matter in arriving at his verdict, would seem to concern a juror's mental processes, and declarations regarding them, accordingly, would be inadmissible...."]; Mesecher v. County of San Diego (1992) 9 Cal.App.4th 1677, 1684 [12 Cal.Rptr.2d 279] ["evidence is inadmissible to impeach a verdict" if it "recite[s] only the reasoning process of the jurors during deliberations"].)
The only "overt" evidence presented concerned the comments by some jurors about their own personal sexual activities and the purported "pressure" imposed on hold-out jurors to change their votes. Case law has concluded such evidence is insufficient to support the possible existence of juror misconduct.
(27) With respect to the jurors' comments about their own sexual experiences, "`[a] jury's verdict ... must be based on the evidence presented at trial, not on extrinsic matters.' [Citation.]" (People v. Wilson (2008) 44 Cal.4th 758, 829 [80 Cal.Rptr.3d 211, 187 P.3d 1041]; see People v. Leonard (2007) 40 Cal.4th 1370, 1414 [58 Cal.Rptr.3d 368, 157 P.3d 973].) For example, in In re Stankewitz (1985) 40 Cal.3d 391 [220 Cal.Rptr. 382, 708 P.2d 1260], the court found that a juror who was a former police officer committed misconduct when he "`consulted' his own outside experience as a police officer on a question of law" and gave the jury "legal advice" that "was totally wrong." (Id. at p. 399.)
But "[a] fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, and injecting `an opinion explicitly based on specialized information obtained from outside sources,' which we have described as misconduct. [Citation.]" (People v. Steele (2002) 27 Cal.4th 1230, 1266 [120 Cal.Rptr.2d 432, 47 P.3d 225].) Thus, in Leonard, the Supreme Court held no misconduct occurred where, during deliberations, a juror said "he had `"plenty of experience firing handguns"'" and "that the murder weapon was an `up close and personal' gun that could be accurately fired at close range without expertise." (People v. Leonard, supra, 40 Cal.4th at pp. 1413-1414.) "[J]urors may rely on their own experiences in evaluating the testimony of the witnesses. `Jurors do not enter deliberations with their personal histories erased, in essence retaining only the experience of the trial itself. Jurors are expected to be fully functioning human beings, bringing diverse backgrounds and experiences to the matter before them.' [Citation.] `Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses: it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the court. Such a weakness, however, must be tolerated.... [Otherwise,] few verdicts would be proof against challenge.' [Citation.]" *826 (Id. at p. 1414.) Thus, the comments of a "[j]uror [who] relied on his personal experience with firearms to form an opinion about the accuracy of the murder weapon, [which] he mentioned ... to the other jurors when expressing his views during deliberations ... were a normal part of jury deliberations and were not misconduct. [Citations.]" (Ibid.)
Here, the jurors' comments about their own personal sexual experiences were based on their life experiences, not any specialized knowledge they had acquired about human sexuality. Thus these comments could not support a finding of juror misconduct.
(28) The same is true for the allegations of juror coercion. It is well settled "`[j]urors may be expected to disagree during deliberations, even at times in heated fashion.' Thus, `[t]o permit inquiry as to the validity of a verdict based upon the demeanor, eccentricities or personalities of individual jurors would deprive the jury room of its inherent quality of free expression.' [Citation.]" (People v. Keenan (1988) 46 Cal.3d 478, 541 [250 Cal.Rptr. 550, 758 P.2d 1081], fn. omitted; see also People v. Cox, supra, 53 Cal.3d at p. 695.)
For example, in Keenan one juror "lost his temper in the course of deliberations[,] ... pointed a finger at ... an elderly woman who was the lone holdout ..., and said, `If you make this all for nothing, if you say we sat here for nothing, I'll kill you and there'll be another defendant out thereit'll be me.'" (People v. Keenan, supra, 46 Cal.3d at p. 540.) The holdout juror "began crying and shaking and went to the bathroom `where ... she vomited.'" (Ibid.) The Supreme Court found no misconduct, noting "[t]he outburst ... was particularly harsh and inappropriate, but as the trial court suggested, no reasonable juror could have taken it literally. Manifestly, the alleged `death threat' was but an expression of frustration, temper, and strong conviction against the contrary views of another panelist." (Id. at p. 541.)
In People v. Ybarra (2008) 166 Cal.App.4th 1069 [83 Cal.Rptr.3d 340], the Court of Appeal affirmed the denial of a new trial motion based on juror misconduct where a juror testified that "after initial balloting showed nine votes for conviction and three votes (including hers) for acquittal a majority juror said the minority jurors were playing `the devil's advocate,' which to her `was like the devil's helper'.... She characterized the deliberations as `intense' and the majority jurors and herself alike as `mad.' She described the tone of the majority jurors as `"Hurry up and just say yes"' and the response of the minority jurors as acquiescence `little by little' in the will of the majority jurors. She said she `wanted to get out of it' but said nothing after a *827 juror who had been a juror before told her `it would not be easy to get out of it' and the judge `would send [her] back and start deliberating more.'" (Id. at p. 1087.)
The comments allegedly "pressuring" the holdout jurors here were far less critical. Consequently, there has been no showing of the type of juror coercion that would support a finding of misconduct during the deliberations in this case. We thus conclude defendant failed to establish the trial court erred in denying him access to the jurors' personal information to support his new trial motion.

DISPOSITION
The judgment is affirmed.
Sills, P. J., and O'Leary, J., concurred.