Filed 2/24/16  P. v. Marroquin CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B259682 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA386122) |
| v. | |
| EDWARD MARROQUIN, | ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |
| Defendant and Appellant. | |

THE COURT:*

It is ordered that the opinion filed January 25, 2016 be modified as follows:

In the second to last sentence of the first paragraph on page 10, line 9, the word "murder" is replaced with the word "crime."

_____

*EPSTEIN, P. J.                    WILLHITE, J.                    COLLINS, J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDWARD MARROQUIN,<br><br>    Defendant and Appellant. | B259682<br><br>(Los Angeles County<br>Super. Ct. No. BA386122) |


APPEAL from a judgment of the Superior Court of Los Angeles County, Sam Ohta, Judge.  Affirmed.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler and Lance E. Winters, Assistant Attorneys General, Margaret E. Maxwell and Eric E. Reynolds, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Edward Marroquin appeals from the judgment entered upon his jury convictions of first-degree murder and possession of a firearm by a felon, with true findings on lying-in-wait and gang-murder special circumstances. Appellant contends the true findings on the special circumstances are not supported by substantial evidence, and the special circumstances are unconstitutionally vague. Appellant also contends the trial court erred in denying his requests to represent himself and for release of confidential jury information. We find no error and affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

As appellant testified at trial, he knew the victim, Ismael Villegas, since they had gone to the same neighborhood school, the 59th Street Elementary School in South Central Los Angeles. In their teens, appellant and Ismael's brother, Sergio, were members of a group of "taggers," who smoked marijuana and vandalized neighborhood properties with graffiti. The group went by the name of RMS, an acronym for "reefers, money, sex" or "reefer my smoke." Ismael, however, was not a member of RMS; he belonged to the Rebels 13 gang in Hollywood.

By 2010, RMS was becoming more criminally oriented. Its tagging activity was encroaching on the territory of two major gangs in the area, the Rollin' 60's and Florencia, and appellant and Sergio were "putting in work" that involved "shoot[ing] up some people." Appellant had a falling out with RMS before he went to prison in 2010. He and his family received death threats, and after that, he viewed members of RMS as his enemies. While in prison, appellant was close with a member of the 18th Street gang, who talked about the gang and encouraged him to join.

After he was paroled in 2011, appellant went to live at his parents' house, less than two blocks away from where the Villegases lived on 2nd Avenue, south of Slauson Avenue. Appellant saw Sergio driving slowly by appellant's family home in the days before shots were fired at the home on May 6, 2011.[1] Appellant did not know who fired

---

[1] Appellant told police his parents' house had been shot at two other times as well.

the shots, but suspected it was Sergio or another member of RMS. Some two weeks later, appellant bought a gun.

On June 22, 2011, appellant and his girlfriend Alyssa Quiroz were near the intersection of Slauson and 4th Avenues, when appellant saw Ismael and his girlfriend Karen Duarte walk into a store across the street. Appellant drove down Slauson Avenue, turned on 2nd Avenue, and parked next to an alley that runs in between and parallel to Slauson Avenue and 59th Street. He did not want his car to be seen from Slauson Avenue, down which he expected Ismael would walk. After waiting at the corner of Slauson Avenue, appellant thought Ismael might go down 3rd Avenue to 59th Street. As he ran back and got into his car, appellant saw Ismael and his girlfriend walking in the alley towards 2nd Avenue. Appellant came out with his gun drawn, yelled "Are you still from Rebels?," and fired several shots before Ismael could answer. Ismael died of three gunshot wounds, two in the lower back and one in the back of the head.

The shooting was captured by the video cameras of a nearby liquor store. Appellant left the scene, but was identified by eyewitnesses and arrested 10 days later. Ballistic evidence established that the gun recovered from appellant's bag at the time of the arrest had been used in the murder, and DNA evidence determined appellant was a possible contributor.

In his interview with police and a recorded conversation with his girlfriend, which were played for the jury, appellant admitted shooting Ismael. He said he had wanted to "bust that job" immediately after he bought the gun, but the first two times he ran into Ismael, he could not act either because his mother was present or because Ismael got on a bus. When he saw Ismael on the day of the murder, appellant thought, "Man, I'm gonna get this nigga." Appellant explained he hid and waited for "a cool minute" because he did not want Ismael to see him and think, "What . . . is this fool doing, waiting right here, you know? He knows me. . . . I was gonna wait until he was in plain sight. . . ." Appellant decided to move to another location after realizing Ismael might take another road home. When he saw Ismael in the alley, appellant jumped out of the car with his

3

gun already cocked, yelled "Fuck Rebels," and did not stop shooting until he finished "doing what he was doing."

Although he denied membership in a particular gang, appellant claimed "gang banging" was his priority, and it was "because of banging that we ended up in this situation." He also stated the 18th Street gang "had [his] back," even though the gang did not get along with any other group.

Appellant was charged with first degree murder in count 1 and felon in possession of a firearm in count 2. (Pen. Code, §§ 187, subd. (a), 12021, subd. (a)(1).)[2] On the murder count, the information also alleged gang and gun use enhancements, as well as gang-murder and lying-in-wait special circumstances. (§§ 186.22, subd. (b)(1)(C), 190.2, subd. (a)(15) & (22); 12022.53, subds. (b)-(d).)

At trial, the prosecutor's gang expert opined that appellant was an active member of the 18th Street gang. The expert relied on appellant's personal possessions recovered from his bedroom in his parents' home: Raiders paraphernalia favored by "southside[]" gangs, including 18th Street, and a notebook with tagging in the name of the 18th Street gang, which included "Alsace," the name of one particular clique of the gang; crossed out names of rival gangs; "187," the number of the Penal Code section for murder; and appellant's nickname, Triste.

Although appellant had many tattoos, including one for "RMS," he had no obvious tattoos associated with the 18th Street gang, with the possible exception of the letter "A" on his finger, which the expert suggested could stand for the "Alsace" clique. One of the predicate homicides on which the prosecution relied to establish the criminal nature of the 18th Street gang was committed by an identified gang member who had no gang-related tattoos, and the expert explained that opting out of such tattoos was a recent tendency in the gang's culture, specifically to avoid harsher sentences. The expert also opined that only an 18th Street gang member could claim that the gang had his back because the gang did not associate with any other gang.

---

[2] All statutory references are to the Penal Code.

According to the expert, the murder benefitted the 18th Street gang, whether or not appellant wanted to retaliate for the shooting of his parents' house, because a gang member is expected to retaliate so as not to be perceived as weak, and committing a violent crime in broad daylight enhances the gang and the gang member's reputation. The expert also believed the murder was largely gang-motivated because the 18th Street gang considered all other gangs to be its enemies, and appellant yelled out a challenge to the Rebels 13 gang immediately before shooting Ismael.

Testifying in his own defense, appellant denied being a member of the 18th Street gang. He claimed he doodled the gang's name because he was lonely when he got out of prison, but he never followed through with joining the gang.[3] He testified he got the letter "A" tattooed on his finger after his arrest in this case, when he found his girlfriend Alyssa was pregnant with his child. Appellant claimed the statements he made after his arrest in this case were exaggerated because he was under the influence of methamphetamine.

The defense gang expert opined that appellant was not an 18th Street gang member because he did not have any tattoos related to that gang. The expert recognized it was possible for a gang member not to have tattoos of his gang, but he had not run across such an individual. The expert opined that an "A" unaccompanied by a symbol for the larger gang was meaningless, and if a tagger joined the gang, he would have to tattoo an "18" over or next to his tagger tattoo to show his undivided loyalty. The expert considered it important that there were no field identification cards identifying appellant as a member of the 18th Street gang, and that defendant had not self-identified during the crime. The expert did not believe appellants' private writings about the 18th Street gang established his membership.

The jury convicted appellant as charged and found all allegations to be true. Appellant was sentenced to life in prison without the possibility of parole, plus 25 years on the gun enhancement (count 1); and three years, plus an additional year for the prison

---

[3] Ismael's girlfriend told police she had learned from Ismael that appellant had joined a gang while in custody.

prior (count 2). He was ordered to pay various fines and fees and given 1,200 days of credit.

This appeal followed.

## DISCUSSION

### I

"A sufficiency of evidence challenge to a special circumstance finding is reviewed under the same test applied to a conviction. [Citation.] Reviewed in the light most favorable to the judgment, the record must contain reasonable and credible evidence of solid value, 'such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Stevens* (2007) 41 Cal.4th 182, 201.)

*A. Lying in Wait*

Section 190.2, subd. (a)(15) establishes a special circumstance of life imprisonment without the possibility of parole (LWOP) if the defendant "'intentionally killed the victim "by means of lying in wait."'" (*People v. Superior Court (Bradway)* (2003) 105 Cal.App.4th 297, 307.) "'The lying-in-wait special circumstance requires "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . ." [Citations.]'" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 500.)

The purpose of the watching and waiting element "'is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse. [Citation.] This period need not continue for any particular length "'of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.'" [Citation.]' [Citation.] 'The factors of concealing murderous intent, and striking from a position of advantage and surprise, "are the hallmark of a murder by lying in wait." [Citation.]' [Citation.]." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1073.)

6

Appellant argues the evidence does not establish a surprise attack from a position of advantage or a substantial period of watching and waiting because appellant approached Ismael in the alley face to face with his gun out, risking that Ismael would draw a gun and shoot him first. The evidence overwhelmingly establishes that appellant did not act out of a rash impulse, but deliberately attacked his victim from a position of advantage. Appellant insisted it was important that he hide while waiting for Ismael to come "in plain sight." He wanted to take advantage of having seen Ismael first by predicting Ismael's movements and planning a surprise attack. Although he miscalculated the exact direction from which Ismael would appear, appellant nevertheless continued to have an advantage over the unsuspecting victim, who had no reason to expect running into appellant. The actual encounter, according to Ismael's girlfriend, was very brief. Ismael did not have a chance to respond to appellant's gang challenge, and he was shot before he could turn and run. There is no evidence Ismael was armed or had time to draw a weapon. Substantial evidence supports the finding that appellant intentionally killed Ismael by lying in wait.

Appellant told the detectives that he hid from view and waited "a cool minute" at the corner of Slauson and 2nd Avenues. He takes issue with the gang expert's opinion that "a cool minute" means a substantial period of time because the opinion was based on hearsay statements of unidentified gang members and violated his right to confrontation. His argument fails for several reasons.

To begin with, it does not matter how long appellant actually waited as long as he had sufficient time to plan a surprise attack on his unsuspecting victim. (See *People v. Mendoza*, *supra*, 52 Cal.4th at p. 1073.) Appellant also is incorrect that the jury would have been unable to deduce the meaning of the phrase "a cool minute" without expert testimony. Appellant used the phrase repeatedly in his interview with police in contexts that implied substantial periods of time. For example, he said he and his girlfriend talked on the phone for hours, and described the conversations as lasting "a cool minute." Finally, appellant's Confrontation Clause challenge to the definition of a slang phrase he used is inapposite because the clause applies to testimonial evidence elicited during

7

structured questioning in a custodial interrogation or a similar setting.  (*People v. Edwards* (2015) 241 Cal.App.4th 213, 261.)  There is no reason to conclude that the gang expert learned the meaning of an innocuous slang expression from testimonial evidence.

*B.  Gang Murder*[4]

Section 190.2, subdivision (a)(22) establishes a special LWOP circumstance if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."  Active participation requires "'involvement with a criminal street gang that is more than nominal or passive[,]'" but does not require actual membership.  (*People v. Castenada* (2000) 23 Cal.4th 743, 752 [interpreting similar language in § 186.22, subd. (a)]; *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 [citing § 186.22, subd. (i)].)  The defendant must "have had knowledge of the gang's criminal purposes."  (*People v. Carr* (2010) 190 Cal.App.4th 475, 487.)  Participation and knowledge may be inferred from "evidence about a defendant's personal conduct, as well as expert testimony about gang culture and habits."  (*Id*. at p. 489.)  The language requiring proof that the murder furthered the activities of the criminal street gang, "substantially parallels the language of section 186.22, subdivision (b)(1), which authorizes a sentencing enhancement for felonies 'committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.'"  (*Id.* at p. 488; see also *People v. Rodriguez*, *supra*, 55 Cal.4th at pp. 1138–1139 [perpetrator may be guilty under § 186.22, subd. (b)(1) even when acting alone].)

Appellant argues that the evidence does not support an inference that he was an active 18th Street gang member, that he knew of the gang's criminal purpose, and that he murdered Ismael for the benefit of the gang.  On the facts of this case, the gang expert's

---

[4] We note that appellant's arguments regarding the gang-murder special circumstance are largely moot because the jury's true finding on the lying-in-wait special circumstance is sufficient to support his LWOP sentence.

testimony was substantial evidence that appellant was a member and active participant in a gang. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 625–626; *People v. Duran* (2002) 97 Cal.App.4th 1448, 1464.) It also demonstrated that appellant acted to promote the interests of a gang. (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 819–820; *People v. Jasso* (2012) 211 Cal.App.4th 1354, 1378.)

Appellant testified that while in prison between 2010 and 2011, and after he had received death threats from his former cohorts at RMS, he developed a close relationship with an 18th Street gang member who encouraged him to join the gang. Although he denied joining, appellant told police "gang banging" was his priority, and the 18th Street gang had his back. Appellant's own statements support the expert's conclusion that appellant was an 18th Street gang member in order to claim that gang's protection. The writing in appellant's notebook, which features variations on the name of the gang, along with the Penal Code section for murder and appellant's nickname, is additional evidence of appellant's connection to the gang and his awareness that the gang commits violent crimes, such as murder.

Appellant focuses on the absence of the typical signs of gang membership, such as gang tattoos, self-admission of membership, or field identification. Even assuming that the "A" on appellant's finger was not gang related, the prosecution's expert testified to the recent development in the gang's culture, where gang members hide their membership in order to avoid sentence enhancements. The culture and habits of criminal street gangs are proper subjects of expert testimony. (*People v. Vang* (2011) 52 Cal.4th 1038, 1044.) Further, the absence of field identification cards connecting appellant to the 18th Street gang in the three months since his release from prison may be due to the fact that the home of appellant's parents was not within the 18th Street gang territory. Appellant's living situation does not necessarily negate his gang membership because the expert testified that members of the 18th Street gang sometimes live outside their gang's territory.

An expert's response to hypothetical questions constitutes circumstantial evidence—and thus substantial evidence—if based on evidence presented at trial. (See

*People v. Vang*, *supra*, 52 Cal.4th at p. 1048; *People v. Rios* (2013) 222 Cal.App.4th 542, 573–574; *People v. Ferraez* (2003) 112 Cal.App.4th 925, 929–930.) Appellant contends the expert's opinion that the murder was for the benefit of the 18th Street gang was speculative, based on *People v. Ochoa* (2009) 179 Cal.App.4th 650 [carjacking], *People v. Ramon* (2009) 175 Cal.App.4th 843 [receiving stolen vehicle], and *In re Frank S.* (2006) 141 Cal.App.4th 1192 [carrying concealed dagger]. Analogizing to these cases is of limited value since none involved gang-related murder, or more specifically the murder of a known gang member after issuing a gang challenge. In *Ochoa*, the expert's suggested gang-related reasons for the murder were grounded in gang culture generally, but not in the facts of the particular case. The expert suggested the crime had been committed in retaliation; yet, there were no facts supporting the theory of retaliation or gang rivalry. (*Ochoa,* at p. 662.)

In contrast, here, appellant acknowledged the 18th Street gang "don't get along with anybody, really. Everybody hates on 18." Appellant insisted he retaliated for the shooting at his parents' house, which he believed was committed by his now-enemies at RMS, including Ismael's brother, Sergio. He denied having any "beef" with Ismael's gang, Rebels 13. Yet, before he killed Ismael, appellant issued a gang challenge that disrespected the Rebels 13 gang. Based on that challenge, the expert testified the murder was gang motivated. The expert's opinion was grounded in the facts of this case, from which he drew legitimate inferences.

It was for the jury, as the trier of fact, to sort through conflicting theories presented by the prosecution and defense. "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60.) We decline appellant's invitation to reweigh the evidence, or to declare the prosecution expert's opinion speculative just because the facts of this case may be unusual.

Appellant seeks to challenge the constitutionality of both special circumstances. The validity of the lying-in-wait special circumstance has been upheld repeatedly. (See *People v. Livingston* (2012) 53 Cal.4th 1145, 1174.) To the extent appellant challenges the definition of active participation in a criminal street gang in *People v. Castenada*, *supra*, 23 Cal.4th 743, 749, we are bound by Supreme Court precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) In reply, appellant makes clear that he only wishes to preserve these issues for additional review. We, therefore, need not further address them here.

III

Appellant argues the trial court abused its discretion in denying his motion for release of confidential jury information to investigate juror misconduct. The motion was based on a note a juror delivered to the trial court over a month after the jury rendered its verdict. The note reportedly stated that "the juror did not want to change the verdict but wondered if this juror did the right thing."

A petition for access to juror identification information must be supported by a declaration citing facts "sufficient to establish good cause" for the release of the information. (Code Civ. Proc., § 237, subd. (b).) If the petition and declaration establish a prima facie showing of good cause, the trial court must set the matter for hearing. (*Ibid*.) To establish good cause, a defendant must make a showing sufficient "to support a reasonable belief that jury misconduct occurred." (*People v. Rhodes* (1989) 212 Cal.App.3d 541, 552; see *People v. Carrasco* (2008) 163 Cal.App.4th 978, 990 ["Even though *Rhodes* was decided before the . . . present enactment [of § 237] requiring a showing of good cause, the *Rhodes* test survived"].) The showing may not be based on speculation that would allow a defendant to "engage in merely a fishing exhibition." (*People v. Wilson* (1996) 43 Cal.App.4th 839, 852.) The trial court's decision to deny juror information is deferentially reviewed for abuse of discretion. (*Carrasco*, at p. 991.)

Appellant relies on *People v. Carrasco*, *supra*, 163 Cal.App.4th 978 to argue that the court abused its discretion in denying the motion without meeting with the juror to

11

determine whether her concerns dealt with her thought process in reaching the verdict or with juror misconduct during deliberations.  In *Carrasco*, a juror hesitated when polled about her guilty vote.  She initially suggested she had reasonable doubt, but further inquiry made clear that her hesitation had nothing to do with the issue of guilt.  (*Id.* at p. 986–987.)  The trial court denied the subsequent motion to release the juror's personal information for lack of showing of misconduct, and the appellate court affirmed.  (*Id.* at p. 991.)

In *People v. Carrasco*, *supra*, 163 Cal.App.4th 978, the inquiry took place during the polling of the jury at the end of trial, and it was prompted by the juror's expression of doubt about her vote.  The case does not stand for the proposition that the trial court must meet with a juror to determine whether a defendant has made a sufficient showing of misconduct on a request to disclose juror information.  Moreover, here, the juror's note to the trial court stated that the juror did not want to change the verdict.  The court reasonably interpreted that statement to mean the juror had no reasonable doubt about the verdict.  The court, also reasonably, concluded that the juror's note did not show juror misconduct, but indicated the juror's need for "affirmance and validation."  There was no need to conduct further inquiry, and the court did not abuse its discretion is denying appellant's motion to disclose the juror's personal information.

IV

Appellant contends he had an absolute right to represent himself in the time between his conviction and sentencing, under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).  Alternatively, he argues the court abused its discretion in denying his *Faretta* motion.

Appellant was convicted on July 2, 2014.  Sentencing was originally scheduled for August 6, but was continued twice: once, after defense counsel filed a motion for new trial, and once again, after appellant sought new counsel under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).  In granting the second continuance, the trial court explained that appellant's *Marsden* motion would be heard on October 15, 2014:  "If it's granted, [sentencing] will be put over.  If it's denied, we'll have the [sentencing] hearing."  On

12

October 15, the court heard and denied the *Marsden* motion. Only after that did appellant request to represent himself. The court denied appellant's *Faretta* motion, as well as the pending new trial motion, and proceeded to sentencing.

Appellant's reliance on *People v. Miller* (2007) 153 Cal.App.4th 1015 (*Miller*) is misplaced. The defendant in that case was held to have "an absolute right to represent himself at sentencing" because his request to do so was made two months before the sentencing hearing and was therefore timely. (*Id*. at p. 1024.) Instead, appellant's case is more akin to that of the defendant in *People v. Doolin* (2009) 45 Cal.4th 390. The defendant in *Doolin* made an unsuccessful *Marsden* motion on the day of sentencing, followed by a *Faretta* motion, which the Supreme Court considered to be "manifestly untimely." (*Doolin*, at p. 454.) Similarly, here, appellant's *Faretta* motion followed the denial of his *Marsden* motion on the day of sentencing. Appellant's contention that the trial court abused its discretion in continuing the hearing on the *Marsden* motion to the day of sentencing is not well taken because appellant was on notice that if the *Marsden* motion were denied, the court would proceed to sentencing on the same day. Because appellant's *Faretta* motion was untimely, he had no absolute right to represent himself.

Nor did the trial court abuse its discretion in denying appellant's request for self-representation. A reviewing court will affirm the trial court's exercise of discretion in denying an untimely motion for self-representation where the record shows the court considered the factors in *People v. Windham* (1977) 19 Cal.3d 121 (*Windham*). (*People v. Marshall* (1996) 13 Cal.4th 799, 827–828.) Those factors include "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Windham*, at p. 128.)

The trial court expressly considered all relevant factors, and its findings are supported by substantial evidence. Appellant has not shown an impairment of his right to counsel. (See *People v. Clark* (2011) 52 Cal.4th 856, 912.) His pre- and post-trial *Marsden* motions were largely based on his belief that counsel did not pursue potential

13

witnesses. However, counsel explained that he had indeed pursued several alternative defense theories, but either the witnesses had been unwilling to testify and incriminate themselves, or the evidence would have been unfavorable to appellant. Moreover, both at trial and at the *Marsden* hearings, appellant failed to name particular witnesses who could testify that Ismael was involved in the shooting of appellant's family home or who could supply any other reason why appellant would kill Ismael. As in *People v. Doolin*, *supra*, 45 Cal.4th 390, 454–455, appellant sought to file a motion for new trial in pro. per., but did not articulate evidence on which he intended to base that motion with any certainty. Under these circumstances, the trial court was within its discretion in denying the *Faretta* motion. Any further delay would have disrupted the proceedings because the victim's family was present to give impact statements and both counsel were prepared to go on with the sentencing hearing.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ESPTEIN, P. J.

We concur:

WILLHITE, J.                    COLLINS, J.

14