[No. B084642. Second Dist., Div. Three. Mar. 18, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIE CURTIS WILSON, Defendant and Appellant.

## COUNSEL

Barbara Springer Perry, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Kenneth C. Byrne and Kristofer Jorstad, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KLEIN, P. J.**—Defendant and appellant Willie Curtis Wilson was initially charged by information with three counts of first degree robbery (counts 1, 2, and 7—Pen. Code, § 211),[1] attempted robbery (count 3—§§ 664/211), attempted murder (count 4—§§ 664/187, subd. (a)) shooting at an occupied building (count 5—§ 246) and murder (count 6—§ 187, subd. (a)). As to counts 1, 2, 3, 4, 6 and 7, it was alleged a principal was armed with a handgun during the commission of the offenses (§ 12022, subd. (a)(1)), and as to counts 1, 2, 3, and 4, it was alleged Wilson personally used a firearm (§ 12022.5).

---

[1]All subsequent statutory references are to the Penal Code, unless otherwise indicated.

Following a jury trial, Wilson was convicted of two counts of second degree robbery (counts 1 and 2), attempted robbery (count 3), shooting into an occupied building (count 5) and first degree murder of Daniel Pipkins (count 6).[2] On April 28, 1993, Wilson's conviction was reversed (*People* v. *Wilson* (Apr. 28, 1993) B056732 [nonpub. opn.]) for a violation of *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]. No determination was made as to the sufficiency of evidence as to any of the counts.

On August 30, 1993, after the case had been remanded to the trial court, Wilson entered a plea of once in jeopardy (§ 1016, subd. (5)) as to the charge in count 6, the first degree murder of Daniel Pipkins for which he had been convicted. The trial court rejected his plea, holding Wilson could be retried on a theory of willful, deliberate and premeditated first degree murder, but not felony murder based upon the robbery of which he had been acquitted, and finding the record of the first trial contained sufficient evidence to sustain the verdict of first degree murder.

After a second trial, a jury found Wilson guilty of second degree robbery with the personal use of a firearm (count 1) and first degree murder of Daniel Pipkins (count 6), and during the commission of both offenses, a principal was armed with a firearm. The jury failed to reach a verdict on counts 2 (robbery), 3 (attempted robbery) and 5 (shooting into an occupied building) and a mistrial was declared as to those counts.

On April 21, 1994, the trial court denied Wilson's motion for a new trial and his motion for disclosure of the addresses and telephone numbers of the jurors.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Count 1—July 21, 1989.*

About 4 a.m. on July 21, 1989, when Victor Montes, the baker at Winchell's Donut House at Liemert Boulevard and 11th Avenue in Los Angeles, moved his car from in front of the donut shop's service window to the rear of the store, he noticed two men standing across the street. Montes went inside for a hose to wash his car and as he came out with the hose, two

---

[2]Wilson was found not guilty of the robbery of Daniel Pipkins (count 7), and the jury deadlocked on attempted murder (count 4). A mistrial was declared as to that count.

men, one of whom was later identified as Wilson,[3] approached him. Both men were carrying guns.

Wilson showed Montes the gun, which was in the palm of his hand, and told him to go inside the store. Out of fear Montes complied and, once inside the store, Wilson ordered Montes to open the cash register. After he opened it, Wilson took out all the money. The second man, who was taller than Wilson, took a gold chain off Montes's neck. Wilson then asked Montes for more money. When Montes told him he did not have anymore, Wilson pointed the gun at him and asked where the safe was located. Montes showed him the safe but told him only the manager had a key. Wilson threatened to kill him and also wanted him to call the manager. He then pointed the gun at the safe and Montes turned to the wall to cover himself. Wilson, however, did not fire his gun but grabbed Montes by the arm and led him to the rear of the store, patting his pockets for more money. As both men left, Wilson pointed his gun at Montes and told him to close the door.

After Montes closed the door, he ran to the service window to ask for help from a friend who was parked outside. Montes then called the police and reported the robbery.

Lawrence Crain, who had been parked on the street in front of Winchell's during the robbery, saw Victor Montes talking to two men inside the donut shop. One man was tall, dark-skinned and wore French braids. The other man was shorter, with short hair and a medium build. Both men wore white T-shirts with a circle. He did not see the two men leave the store but heard Montes yell to him he had been robbed and for him to get his gun. Montes told Crain the robbers had pointed a gun at him and that he had recognized one of the robbers. Crain tried to find the robbers in his car, but was unable to do so and returned to Winchell's.

2.  *Counts 2, 3, and 5—July 22, 1989.*

About 2 a.m. on July 22, 1989, Montes thought he recognized two men walking into Winchell's parking lot as the two robbers from the day before, and called the police. While he was on the telephone, he heard four or five gunshots. Crain, who was standing outside of Winchell's, also recognized the two men from the day before. After he walked back to his car, he heard gunshots and saw a lot of cars speeding away. At the time, he did not know where the two men were and had not seen anyone firing guns.

---

[3]Montes stated he had seen Wilson twice before, the first time at the home of Montes's girlfriend, Rowena Sims, when she introduced him as a friend of her brother, Dwayne. Later, as he was making donuts, he saw appellant and Dwayne at Winchell's service window.

Timothy Reed, Chris Kelly and Daniel Ohr were standing next to Ohr's car in the Winchell's parking lot about 2:30 a.m. on July 22, when Reed saw two men in a dark-colored Cadillac slow down and circle the block two or three times. The car stopped and the men got out, holding guns at their sides. The taller of the two men was about six feet tall and dark-complected and wore french braids. The other was about five feet, seven or eight inches tall, with a lighter complexion and short hair. The tall man approached Daniel Ohr, who was wearing a lot of jewelry, pointed his gun at Ohr's head, and started taking off Ohr's jewelry. The short man stood nearby. The tall man took all of Ohr's jewelry and money and asked Kelly and Reed if they had any money. They replied no. The tall man then told Reed if he found any money on him, he would kill him. He searched Reed's pockets and after failing to find any money, he took Reed's ring. Reed stated Wilson resembled the shorter man.

### 3. *Count 6—August 6, 1989.*

About 4 a.m. on August 6, 1989, Frank Davis and Casey Gatlin were at Winchell's parking lot with a group of about 26 to 30 homosexual men who earlier had been at the Horizon Club when Davis saw two Black men in a Cadillac drive slowly into Winchell's driveway and stop in front of the door. Davis noticed Wilson in the passenger's seat and remembered having seen him before because he thought he was "cute." Davis watched the two men as they talked to each other, and saw Wilson reach for something in the back. The men continued to look around and Wilson once looked down towards his lap.

Davis started having "bad vibes" as to why the two men were there and felt something was wrong. He passed the word among the group that they should leave and get together at Liemert Park. As they left, Davis saw Daniel Pipkins walking to his car. Several minutes later, Davis returned to Winchell's to see whether Pipkins had left. When he got back to the parking lot, there were only two or three cars left and one of them belonged to Pipkins. There was a car parked next to Pipkins's, but no one other than Pipkins was in either car. At the time they returned, Pipkins was in his car in a condition resembling that depicted in People's exhibit No. 2, but he was still alive. The cause of Pipkins's death was a gunshot wound which perforated his chest and abdomen.

Eric Davis (Eric) also was at Winchell's when the two men drove the dark Cadillac into the parking lot. When Eric saw a lot of people leaving, he, too, started to leave but couldn't because Pipkins's car was parked behind him. The Cadillac pulled alongside of him and the man in the passenger's seat

pointed a gun at him. He ducked down and the two men were laughing. When Eric blew his horn, Pipkins started to back his car up. Eric left while Pipkins's car was still in the parking lot and, as he drove away, he saw someone get out of the Cadillac and approach Pipkins. Eric became concerned and returned to the parking lot to see if Pipkins was all right. He saw Pipkins talking to the passenger of the Cadillac and started to drive away. As he was leaving, he heard two gunshots. He kept driving because he was scared.

Crain also was at Winchell's at the time of the incident and recognized the two men in the Cadillac as having been at Winchell's the night before. He, however, could not say for certain that Wilson was the passenger in the Cadillac. After he heard a gunshot, he got out of his car and approached Pipkins. His eyes were barely open but he was still alive. Crain ran to a phone booth and telephoned the police.

Detective Charles Merritt arrived at Winchell's about 6:30 a.m. on August 6, 1989, and Crain gave him the license number of the Cadillac, which he had earlier written down. Merritt obtained the name and address of the registered owner of the Cadillac and, based upon that information, the police staked out an apartment building not far from Winchell's. Merritt saw the Cadillac parked in a nearby alley on August 7, 1989, and followed it as Wilson drove it past him. Merritt stopped the Cadillac and arrested Wilson.

After waiving his rights, Wilson first stated he had been with friends in Pasadena on both Saturday and Sunday nights. Later he changed his story and admitted that on August 6, he drove his Cadillac over to Will's house, picked up Raynard and went to the Hobart Club where they stayed until 4 a.m. After they left, they went to Winchell's for a donut and juice. Raynard said, "I think I want to jack me a fag," meaning he wanted to rob a homosexual. At that point, Wilson got out of the car and went inside Winchell's. When he returned, they drove away. After turning onto 11th Street, Raynard told him to stop the car. Raynard jumped out of the car, walked over to a yellow Ford Granada and began talking to the driver. Wilson then heard a shot. Raynard returned to the car and said, "I shot that fool." Afterwards, Wilson drove Raynard back to his car. Merritt reduced Wilson's statement to writing and after reading it, Wilson signed it.

Wilson's testimony from the first trial was read into evidence as part of the prosecution's case. He denied being at Winchell's on July 21 or robbing Montes. Wilson, however, admitted being at Winchell's on August 6 with Raynard. He denied Raynard had told him he wanted "to jack a fag." He stated Raynard got out of his car for about two or three minutes, and he

heard a gunshot. When Raynard returned he asked him what had happened and Raynard said "nothing happened." Wilson drove away, and he was arrested the next day.

Rowena Sims testified she dated Montes about twice a week in December 1988, and Wilson had never been at her home when Montes was there. She stated she had never seen Wilson prior to being shown his photograph in June 1990.

## CONTENTIONS

Wilson contends (1) his retrial on count 6 on the theory of deliberate premeditated first degree murder violated the protections against double jeopardy guaranteed him by the United States Constitution; (2) the trial court properly precluded retrial on count 6 on the theory of first degree felony murder since no further proceedings can be conducted on that theory; (3) even if preclusion of the theory of first degree felony murder had not been compelled, the prosecutor's acquiescence in the preclusion bars any further prosecution on that theory; (4) submission of count 6 to the jury on a theory of second degree felony murder violated Wilson's double jeopardy rights; (5) it was error to submit count 6 to the jury on a theory of second degree felony murder because conspiracy is not an inherently dangerous felony; (6) application of the test of inherent danger adopted in *People* v. *Patterson* (1989) 49 Cal.3d 615 [262 Cal.Rptr. 195, 778 P.2d 549], is constitutionally compelled in the present case by the collateral estoppel doctrine; and (7) the trial court erroneously denied his request for disclosure of the jurors' addresses and telephone numbers.

## DISCUSSION

1. *Wilson's retrial for first degree murder did not violate the guarantee against double jeopardy.*

a. *Factual and procedural background.*

Wilson's contention his retrial for first degree murder on the theory of deliberation and premeditation violated his double jeopardy rights is without merit. From the record, it appears the jury in Wilson's first trial found him guilty of the first degree murder of Pipkins. The prosecution's theory of first degree murder was on a felony-murder theory. The prosecution did not argue, and the jury was not instructed, on deliberate and premeditated first degree murder.

The same jury also acquitted him of the underlying robbery of Pipkins.

On appeal, Wilson's entire judgment of conviction was reversed for *Wheeler* error. The acquittal of the robbery clearly barred retrial of the robbery, and, as the prosecution conceded, it also barred retrial of the murder charge on a felony-murder theory.

On remand, Wilson entered pleas of once in jeopardy as to both the robbery and first degree murder. In response to Wilson's pleas, the trial court conducted a series of lengthy hearings during which the prosecutor recalled that at the close of evidence in the first trial, during discussions in chambers about the jury instructions to be given, she had decided not to proceed with a deliberate and premeditated theory because the trial court had indicated if she did, it would give a unanimity instruction. The prosecution stated such an instruction "would make the case much more confusing for the jury. Nothing to do with whether there was evidence of deliberate premeditated murder." Consequently, the prosecutor decided to proceed only on felony murder and withdrew CALJIC No. 8.20, the instruction on premeditated and deliberate murder, which she had previously requested. Further at the hearing and in response to the trial court's questions, the prosecutor stated there was sufficient evidence presented during the first trial to support premeditation. Defense counsel disagreed, and the trial court, distinguishing *People* v. *Asbury* (1985) 173 Cal.App.3d 362, 366 [218 Cal.Rptr. 902],[4] replied: "The defendant undoubtedly was once in jeopardy on a felony murder theory that there can be no dispute, and [the prosecutor] concedes that. I query whether [Wilson] has been once in jeopardy on the assertion or charge of deliberate and premeditated murder."

The trial court then decided to read the transcript of the first trial before ruling on the motion, After doing so, the trial court found the People's theory at the first trial was "essentially either felony murder by reason of robbery or attempt [*sic*] robbery or aiding and abetting in the commission of a robbery which resulted in a death." The trial court also noted the prosecutor originally had requested CALJIC No. 8.20, but later withdrew it. In response to questioning, the prosecutor explained she withdrew the instruction because the defense had argued the jury would have to agree unanimously whether Wilson was the shooter or driver. She felt, as a matter of trial tactics, the felony-murder theory would be less confusing and the more effective theory to present to the jury.

The trial court denied the motion, stating, "based upon the representation of the People, firstly the fact that the reason for withdrawing the instruction

---

[4]In *Asbury*, the court held when the trial court refused to instruct on premeditated murder due to insufficient evidence, it impliedly acquitted defendant of that charge and the defendant could not be tried on that charge after his felony-murder conviction had been reversed.

of premeditation and deliberation was a desire to avoid confusion, based upon the totality of the circumstances I do not feel that the People are precluded from retrying the defendant on first degree murder. . . . [¶] . . . [¶] . . . [B]ased upon the totality of the circumstances the court finds sufficient evidence in the record to justify the verdict the jury in fact arrived at, to wit, first degree murder, not withstanding the absence of a felony murder basis because they acquitted him of the robbery or attempt[ed] robbery."

b.   *The Double Jeopardy Clause.*

■   The double jeopardy clause of the United States Constitution applies to a new trial following either conviction or acquittal (*North Carolina* v. *Pearce* (1969) 395 U.S. 711, 717 [23 L.Ed.2d 656, 664-665, 89 S.Ct. 2072].) However, these principles are not to be applied in a rigid or mechanical fashion (*Arizona* v. *Washington* (1978) 434 U.S. 497, 506 [54 L.Ed.2d 717, 728, 98 S.Ct. 824]), and the double jeopardy clause, with minimal exceptions, does not prohibit the retrial of charges after a successful appeal. (See *United States* v. *DiFrancesco* (1980) 449 U.S. 117, 131 [66 L.Ed.2d 328, 341-342, 101 S.Ct. 426]; *North Carolina* v. *Pearce, supra,* 395 U.S. at p. 721 [23 L.Ed.2d at p. 667]; *People* v. *Mattson* (1990) 50 Cal.3d 826, 849 [268 Cal.Rptr. 802, 789 P.2d 983].) The protection of the double jeopardy clause by its terms applies only if there has been an event, such as an acquittal, which terminates the original jeopardy. (*Richardson* v. *United States* (1984) 468 U.S. 317, 325 [82 L.Ed.2d 242, 250-251, 104 S.Ct. 3081].)

An exception to the rule permitting retrial following reversal on appeal is when the conviction was reversed because of insufficiency of the evidence. (*Burks* v. *United States* (1978) 437 U.S. 1, 18 [57 L.Ed.2d 1, 14, 98 S.Ct. 2141]; *People* v. *Superior Court* (*Marks*) (1991) 1 Cal.4th 56, 72 [2 Cal.Rptr.2d 389, 820 P.2d 613].)

Double jeopardy also bars a retrial when the first jury had an opportunity to return a verdict on a greater charge, but instead reached a verdict on the lesser charge. (See *Price* v. *Georgia* (1970) 398 U.S. 323, 329 [26 L.Ed.2d 300, 305, 90 S.Ct. 1757].) However, as reiterated in *People* v. *Santamaria* (1994) 8 Cal.4th 903, 911 [35 Cal.Rptr.2d 624, 884 P.2d 81], ". . . an inherently inconsistent verdict is allowed to stand; if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both. [Citations.] . . . The jury may have been convinced of guilt but arrived at an inconsistent acquittal or not true finding 'through mistake, compromise, or lenity . . . .' [(*United States* v. *Powell* (1984) 469 U.S. 57, 65 [83 L.Ed.2d 461, 468, 105 S.Ct. 471].)]

. . . [¶] Thus, as a general matter, double jeopardy principles would not preclude defendant's retrial on the murder charge despite the earlier reversal, and the murder conviction would be allowed to stand even if inconsistent with the not true finding on the use enhancement."

### c. *Ruling here.*

■ Here, the prosecution, because of trial tactics, did not present the premeditation theory to the jury. The jury found Wilson guilty of first degree felony murder but also, inconsistently found him not guilty of the underlying robbery. This apparent inconsistency in its verdict does not bring into play the principles of double jeopardy and prevent Wilson from being retried on the theory of first degree premeditated murder.

In addition, as the trial court found, from the record of the first trial, there clearly was sufficient evidence to justify a verdict of first degree murder without the felony-murder basis, and the premeditated murder theory was never presented to the jury in the first trial. Jeopardy never attached in this instance. This is not a case where it can be said there was successive prosecutions or multiple trials by the prosecutor, either intentionally or negligently. This is an instance where there was merely a retrial in the same prosecution. Contrary to Wilson's arguments, the principles of the double jeopardy clause were not violated. (See *Schiro* v. *Farley* (1994) 510 U.S. 222, 232 [127 L.Ed.2d 47, 58, 114 S.Ct. 783].) Under these circumstances, the trial court did not err in denying Wilson's plea of once in jeopardy on the murder charge.[5]

### 2. *No error occurred by denying the request for disclosure of the jurors' addresses and telephone numbers.*

■ Wilson's contention the trial court erred in denying his request for the addresses and telephone numbers of the jurors is without merit. In support of his motion, defense counsel in his declaration stated, "Good cause for the disclosure of the requested information exists because it appears that the verdict as to first degree murder was reached based on the following premise: If Mr. Wilson was at the scene, whether he was the shooter or not, he was a principal. If he brandished a gun he must have intended to use it; if

---

[5]Since we are affirming the judgment, Wilson's arguments concerning the propriety of further proceedings are moot and need not be discussed. As to Wilson's argument the trial court erred in permitting the jury to consider the second degree felony-murder theory, even if error existed, the jury, in finding him guilty of first degree murder, necessarily found he acted with malice and with willfulness, premeditation and deliberation. Thus, it was not necessary for the jury to reach or consider the second degree felony-murder theory, and any error in presenting this theory was harmless.

he intended to use it he must have thought of it beforehand; and if someone died as a result of that incident the murder must be premeditated."

The record shows that at the time the trial court dismissed the jury, it advised the jurors the admonition against their discussing the case had been removed, and the attorneys would be available to answer their questions, if they had any. It stated, "You don't have an obligation, but if you have any questions for them, I'll send them out. [¶] Sometimes it's helpful for them to discuss the case with you to find out what your impressions were on various issues, and it helps them try cases again in the future, so that's it."

Wilson argues this statement by the trial court to the jury was "wholly inadequate" under Code of Civil Procedure sections 206 and 237 in that the trial court did not advise the jurors they had a right to request their identifying information be sealed and, also, failed to provide notice to the jurors of their right to appear and contest the request. He asserts that as a result of the trial court's failure to comply with sections 206 and 237 of the Code of Civil Procedure, he was denied access to jurors even though they had never refused to speak to his counsel, had never requested their identifying information be sealed, were never advised of counsel's request for access to them, and no evidence of disclosure of the information to defense counsel would have put them at any risk.

On April 21, 1994, the date of sentencing, the trial court denied Wilson's motion and stated, "I think the declaration is insufficient to grant the petition or the request made to disclose the jurors' addresses and locations. [¶] I think the declaration is lacking in specificity as to the basis for such a disclosure. I think the declaration states merely, at best, speculation on the part of how the jurors might have arrived at their verdict. [¶] I think what's needed is some showing, some indication, some basis for some type of juror misconduct, and I don't see that, and I think that is lacking in this declaration, . . . ."

Under *People* v. *Rhodes* (1989) 212 Cal.App.3d 541, 553-554 [261 Cal.Rptr. 1], a defendant's motion for disclosure of the name, addresses and telephone numbers of the jurors who convicted him had to be (a) timely and (b) accompanied by a sufficient showing to support a reasonable belief jury misconduct occurred, diligent efforts were made to contact the jurors through other means, and that further investigation was necessary to provide the court with adequate information to rule on a motion for new trial. A failure to make this required showing justified denying the request for disclosure.

Under former subdivision (a) of section 237 of the Code of Civil Procedure, "[t]he names of qualified jurors drawn from the qualified juror list for

the superior court shall be made available to the public upon request unless the court determines, pursuant to subdivision (b), that a compelling governmental interest requires that this information should be kept confidential or its use limited in whole or in part."

Under former subdivision (b) of Code of Civil Procedure section 237, "[a]t the conclusion of a criminal jury proceeding, the court may, upon a juror's request, motion of counsel, or on its own motion, order that all or part of the court's records of personal juror identifying information be conditionally sealed upon finding that a compelling governmental interest warrants this action. Prior to discharging the jury from the case, the judge in a criminal action shall notify the jurors of the right of any juror to request sealing of personal juror identifying information pursuant to this section. For purposes of this section, 'compelling governmental interest' includes, but is not limited to, protecting jurors from physical harm or the threat of physical harm."

Code of Civil Procedure section 206 reminds the court to give the jurors the notice required by Code of Civil Procedure section 237 (Code Civ. Proc. § 206, subd. (a)) and authorizes the prosecutor, defense counsel and their representatives to talk to the jurors after they are discharged, "provided that the juror consents to the discussion and that the discussion takes place at a reasonable time and place." (Code Civ. Proc., § 206, subd. (b).) Subdivision (e) indicates the statute is not meant to prohibit a peace officer from investigating an allegation of criminal conduct. (Code Civ. Proc., § 206, subd. (e).) Former subdivision (f) then provides that, "[n]otwithstanding Section 237, a defendant or defendant's counsel may, following final adjudication of a criminal proceeding, request that the court provide personal juror information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing issues on appeal or any other lawful purpose. This information may include jurors' names, addresses, and telephone numbers. [¶] Pursuant to this subdivision, the court shall provide the information requested to the defendant's counsel or any agent of the defendant's counsel but may limit dissemination as provided under subdivision (d) of Section 237." (Code Civ. Proc., § 206, subd. (f).)

Finally, former subdivision (d) of Code of Civil Procedure section 237 permits the court to limit access to sealed records "to the defendant, the defendant's counsel, or the defendant's investigator for the purpose of developing issues of [*sic*] appeal or for any other lawful purpose. The court may require agreement that the defendant, defendant's counsel, or defendant's investigator not divulge jurors' identities or identifying information to others."

The court in *People* v. *Simms* (1994) 24 Cal.App.4th 462, 465-566 [29 Cal.Rptr.2d 436], found the rule enacted in *Rhodes* had been overruled by the subsequent enactment of sections 206 and 237 of the Code of Civil Procedure, and held a defendant can obtain access to the names, addresses and telephone numbers of the jurors merely upon a showing he wanted the information "for the purpose of developing issues for appeal or for some other lawful purpose."

Contrary to the reasoning expressed in *Simms,* the last sentence of section 206 of the Code of Civil Procedure does not mandate disclosure of jurors' names, addresses, and telephone numbers upon request. Contrary to Wilson's arguments, the last sentence of section 206 of the Code of Civil Procedure merely regulates to whom, not whether, disclosure shall be made. In addition, former subdivision (f) of section 206 of the Code of Civil Procedure limits the disclosure "for the purpose of developing issues on appeal or any other lawful purpose." Although this language is broad, it does indicate a legislative intent to require the defendant show good cause for disclosure and not engage in merely a fishing exhibition.

In construing section 206 of the Code of Civil Procedure, a court also must consider the declared statutory purpose of protecting the lives and safety of jurors who serve in criminal cases, especially in the current political climate. The disclosure of jurors' addresses and telephone numbers involves a sensitive issue. Most jurors are greatly concerned about their privacy, and rightly so. If the *Simms* interpretation is allowed to stand, the public soon could believe a defendant is entitled to the names, addresses and telephone numbers of jurors if they vote to convict him and overlook the subtle difference that the information is given only to his lawyer. This knowledge would impair both the willingness of citizens to serve on juries and most importantly, their impartiality, if they do so serve.

Contrary to the reasoning of *Simms*, it is impossible to believe the Legislature enacted subdivision (f) of section 206 of the Code of Civil Procedure for the purpose of requiring disclosure upon request. Clearly, subdivision (f) does not disturb the holding of *Rhodes* requiring the defense to show good cause before this information is divulged.

Here, as the trial court stated, defense counsel's request did not show good cause and stated "at best, speculation on the part of how the jurors might have arrived at their verdict," no showing whatsoever was made on any type of juror misconduct. Defense counsel did not disclose the source of his information, and he did not explain his speculative account of how the jurors may have reasoned about the case constituted juror misconduct. Under these circumstances, there was no error.

## DISPOSITION

The judgment is affirmed.

Croskey, J., and Kitching, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 19, 1996. Werdegar, J., was of the opinion that the petition should be granted.