Filed 4/5/21  P. v. Young CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>REGINALD RAYDELL YOUNG,<br><br>Defendant and Appellant. | B294537<br><br>(Los Angeles County<br>Super. Ct. No. MA064957) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charles Chung, Judge.  Modified in part; affirmed in all other respects.

Tanya Dellaca, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen and Charles S. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Reginald Young appeals from his conviction for felony murder, attempted robbery, and burglary.  He contends the court erred by denying his request for a hearing in support of his petition to disclose juror information.  He also urges remand to allow the trial court to exercise its discretion to strike the firearm enhancements imposed under Penal Code sections 12022.53 and 12022.5,[1] and for a hearing on his ability to pay the fines and fees imposed at sentencing.  Finally, he points out several errors in the abstract of judgment, sentencing minute order, and his award of conduct credits, all of which respondent Attorney General concedes requires correction.  We conclude the trial court did not abuse its discretion in finding appellant had not established good cause for a hearing on the disclosure of juror information.  Further, we do not find remand warranted for sentencing or regarding appellant's ability to pay.  We therefore affirm the judgment and order the trial court to correct errors in the abstract of judgment and sentencing minute order as detailed below.

## PROCEDURAL HISTORY

An information filed in 2015 and amended in 2017 charged appellant, Erin Chase[2], and Jason West with the murder of Marc Spinner (§ 187, subd. (a), count one), attempted robbery (§§ 664, 211, count two), and burglary of an inhabited building (§§ 459, 667, subd. (c), count three).  The information further alleged appellant personally used a firearm (§ 12022.53, subds. (b)-(d) [counts 1-2]; § 12022.5, subd. (a) [count 3]) and that a principal

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

[2]Erin Chase is also referred to in the record as Joshua Chase.

was armed with a firearm (§ 12022, subd. (a)(1) [counts 1-3]). The information also alleged that the murder was committed while appellant was engaged in the attempted commission of a robbery (§ 190.2, subd. (a)(17)(A)).

In June 2017, the court declared a mistrial after the jury in appellant's first trial declared it was deadlocked. Appellant was re-tried in October 2018. On October 30, 2018, the jury found appellant guilty on all three counts. The jury also found true the firearm allegations under section 12022.53, subdivision (d) (counts one and two) and section 12022.5, subdivision (a) (count three), as well as the allegation that appellant committed the murder during the commission of an attempted robbery.

On December 11, 2018, appellant filed a petition for disclosure of juror information. The People filed an opposition, arguing that appellant had not shown good cause for release of juror information. The court denied the motion.[3]

The court sentenced defendant to life in prison without the possibility of parole on count one, plus 25 years to life pursuant to section 12022.53, subdivision (d). On count two, the court imposed the upper term of three years, plus 25 years to life pursuant to section 12022.53, subdivision (d); on count three, the court imposed the upper term of six years, plus the high term of 10 years pursuant to section 12022.5, subdivision (a). The court stayed the sentences on counts two and three pursuant to section 654. Appellant timely appealed.

---

[3]We discuss further details regarding this motion in Discussion Section I below.

# FACTUAL BACKGROUND

## I.  Prosecution Evidence

### A.  *The incident*

The victim, Marc Spinner, lived in Lancaster, California with his mother and two brothers, Joshua and Cameron.  Early in the morning on June 28, 2014, deputy Wesley Guthrie of the Los Angeles County Sheriff's Department (LASD) responded to a report of shots fired at the Spinner residence.  Guthrie testified that he entered the home through the open garage and saw bullet holes in the door leading from the garage into the house.  There was something heavy blocking the door and he could see blood on the floor, so he and another deputy entered the home through the front door.  In the hallway leading to the garage, the deputies found Spinner slumped against the door.  His hands and feet looked like they had been bound and there was a safe on the ground next to him.  Spinner was pronounced dead at the scene.  Deputies discovered Cameron asleep in his bedroom.  Cameron testified that he did not hear anything during the incident and was sleeping with noise cancelling headphones.

### B.  *Investigation*

LASD investigators found four gun cartridge cases in the garage and one in the hallway, and five bullet holes in the door from the garage into the house.  Inside the safe found next to Spinner, detectives discovered prescription pill bottles; marijuana; a concentrated form of cannabis called "wax"; and cash.

For several months, LASD detectives had no potential suspects.  Then, in November 2014, the results from DNA taken from Spinner's fingernails showed appellant's DNA.  Appellant had been arrested in July 2014, about two weeks after the

4

incident, for possession of marijuana for sale and possession of a handgun. After receiving the DNA results, detectives matched the gun taken from appellant to the cartridge cases from the murder scene. Appellant was arrested on December 16, 2014. Detectives later arrested West and Chase.

Spinner's autopsy revealed three gunshot wounds: a fatal wound on the top of the head, one through his left thigh, and a superficial wound on his abdomen. The parties stipulated at trial that duct tape on Spinner's ankle contained DNA of Spinner and Chase, and nail clippings from Spinner's hands contained DNA from Chase and appellant. The parties also stipulated that the gun recovered from appellant fired the bullet found in Spinner's head, as well as the five cartridge cases recovered from the residence and two expended bullets found inside the home.

C. *Appellant's interviews*

LASD detective Louis Aguilera and his partner conducted two interviews with appellant after he was arrested on December 16, 2014.[4] The prosecution played excerpts of the interviews for the jury.

During the first interview, appellant denied knowing or recognizing Spinner. He admitted that the gun he had at the time of his arrest in July was his and said he bought it in mid-July from a guy known as "G-man."

A few hours later, during his second interview, appellant admitted that he heard about Spinner from West, who was his "wife's sister's baby father." West told appellant that "he knew a guy that knew how to bake my weed into 'Wax.'" Appellant told

---

[4]The court found that appellant had validly waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 at the start of the interviews.

5

the detectives that on June 27, 2014, he was hanging out with West and appellant's cousin, Chase. Around 7:00 p.m., West suggested that they should meet Spinner because West wanted to buy some "Xanax bars." West drove them to Spinner's house. Appellant claimed they had not planned to rob Spinner, but that during the car ride, West told them that Spinner had two safes in his room. Appellant also said that "before we even got out of the car it was a discussion with me and [West] about the guy having stuff in the house. So, I guess you could say yes, we did plan to rob it."

After they parked near Spinner's house, West went in first to buy the Xanax bars, while Chase and appellant waited in the car. Once West returned, he told appellant that he could "go in there and meet the guy," to see if he would sell appellant some marijuana, and that Spinner was not a "small time guy." Appellant and Chase walked up to the house and saw that the garage door was partially open. They walked into the garage and knocked on the door leading from the inside of the garage into the house. Spinner opened the door and appellant told him they wanted to talk about buying some weed. Appellant said Spinner seemed high, and he asked if they wanted to smoke some marijuana. The three men went to Spinner's bedroom, smoked marijuana, and talked. Appellant said that he was looking around Spinner's bedroom, but did not see any of the big safes that West had described, just one little safe. According to appellant, Spinner "start[ed] getting hysterical" and saying they were going to rob him. Appellant insisted that was not true. Appellant had noticed a rifle in the room, and when Spinner appeared to move toward the rifle, appellant grabbed Spinner. Appellant grabbed the rifle and threw it on the bed, then Chase

6

started punching Spinner.

Appellant admitted that he had his gun with him. He stated that at this point he was just trying to leave, and he drew his gun while Chase duct taped Spinner's wrists so he would not come after them. Appellant explained that when things escalated, he thought "this is obviously getting violent, so I'm like well, there might be something in the safe so let's go ahead and just tie him up." Then Chase grabbed the safe and left the room. However, Chase dropped the safe near the garage door. He later told appellant that he could not open the door and the safe was too heavy. As appellant was leaving, he was trying to close the door between the garage and the house, when he saw Spinner coming around the corner holding the rifle. Appellant fired his gun through the door back into the house multiple times, then took off running. He claimed that he did not intend to use his gun or shoot at anyone, and he did not intend to hit Spinner, but was "hoping that it would scare him off enough so we could just leave." Appellant learned later from West that Spinner had died, but he thought maybe Spinner was killed in some other incident "because when I shot, I was on the other side of the door."

## II.    Defense Evidence

Appellant testified that he was 25 years old at the time of the incident. He first learned about Spinner a few days before the incident, when West mentioned he knew a dealer who might be a more consistent marijuana supplier. Appellant claimed that when he met with West and Chase on June 27, 2014, he was thinking about finding a supplier, not about robbing Spinner.

As they headed to Spinner's house, West started talking about how Spinner was "big time," and had large safes and lots of money, but appellant just thought West was trying to convince

7

him to meet with Spinner, not to rob him.  Appellant testified that he and Chase entered Spinner's house through the garage and knocked on the door.  Spinner answered and they explained who they were, went to his room, talked, and smoked marijuana.  Appellant had his gun with him because he generally carried it with him.  When Spinner became agitated and accused them of being there to rob him, appellant denied it and tried unsuccessfully to calm him down.  Appellant had noticed a rifle near the door when they entered the room.  As Spinner became more agitated, appellant thought Spinner was "going for the rifle," so appellant grabbed his arm.  He could not tell at the time that the rifle was a BB gun.  They started shoving and then punching each other.  Appellant tried to leave but the fight continued, so he told Chase to grab the duct tape on Spinner's dresser and tape Spinner so they could leave. He took out his gun while Chase was taping Spinner's wrists, to "get him to be still."

Appellant explained that when he told police that "I guess you could say we did plan to rob him," he meant it could be perceived that way after the fact, not that he had that intention at the time.  Appellant had agreed with the detectives when they asked if he decided to rob Spinner during the fight because he "felt like it was what they wanted to hear."  Appellant noted that he did not take anything from Spinner's house and did not tell Chase to take anything.  He claimed he did not see Chase grab the safe.

Appellant left the room and was trying to close the garage door behind him when he saw Spinner coming around the corner.  He thought Spinner was holding the rifle and was going to shoot him, so he "pulled the trigger."  His intention was to scare Spinner off.  He did not know at the time that he had hit him.

8

Appellant also presented two witnesses who testified that appellant did not have the character for violence or robbery.

## DISCUSSION

### I.    Disclosure of Juror Information

Appellant contends the trial court erred in finding he did not make a prima facie showing of good cause in support of his petition for disclosure of juror identifying information.  We find no abuse of discretion and therefore affirm.

#### A.    *Background*

During a break from the presentation of the defense case at trial, the court stated that it had received information requiring inquiry of jurors number 6 and 12.  First, the court asked juror number 6 whether there was anyone associated with the case who spoke to her.  The juror disclosed that "before I knew who that person was," she had an interaction with a woman she believed to be "the grandmother of the first gentleman that testified [Spinner's brother Cameron]. . . .  I don't know that for sure."  Juror number 6 further explained that while waiting in the court cafeteria to order food, she was standing behind the woman, "[a]nd she said, 'the menu is up here.' And I thought she was a juror and she said, 'I'm not a juror.'  And I said, 'Oh.'  But she said, 'it would be improper for me to tell you who I am' at that point."  Later on a break, after Cameron testified, another juror told juror number 6 that she thought the woman from the cafeteria was Cameron's grandmother.  The juror stated she had not had any other conversations with this woman.  She responded "no" when asked if there was anything about that interaction that would cause her to favor one side over the other.

Next, juror number 12 told the court that after hearing appellant's police interviews, he realized that he graduated from

9

the same high school at the same time as appellant. The juror also recognized appellant's wife when she came into court, although he said they were not friends or even acquaintances.

After trial had concluded, appellant filed a petition for disclosure of juror information. His counsel asserted that he needed to communicate with the jurors "for the purpose of verifying that no discussions about anything not received through evidence happened," and that the information might lead to evidence supporting a motion for a new trial. He noted that the jury foreperson (juror number 12) attended high school with appellant and that appellant's family "asserts that some jurors were speaking outside with the victim's family during the trial." The People filed an opposition, arguing that appellant had not shown good cause for release of juror information.

In support of his claim, appellant filed a second motion requesting access to the court hallway security video footage. The supervising judge denied the motion, finding that appellant had not established good cause and that his evidentiary proffer was "too speculative" to justify the cost and the risk to court security.

Following denial of appellant's motion to obtain security footage, the trial court heard argument regarding appellant's motion to discover juror information. Appellant's counsel stated that he had spoken with appellant's family, who indicated there was an additional contact between juror number 6 and someone in the victim's family outside the courtroom. Appellant's counsel also noted the relationship previously disclosed by juror number

10

12.

The court recalled the questioning of jurors number 6 and 12 during trial, that juror number 6 stated that the conversation was brief and "wholly unrelated" to the case, both jurors confirmed that they could be fair, and both remained on the jury. The court found that "[t]o go beyond that and say that somehow because of that improper jury deliberations were had or improper information was relayed to the jury I think is speculative at best."

The court then turned to appellant's new allegations and inquired whether appellant had supporting evidence regarding the latest contact. Samantha Maybon, appellant's mother, testified that she saw an older lady from Spinner's family approach the water fountain on a break and "exchange[ ] words" with juror number 6, but she did not know what was said. Maybon also stated, without further detail, that Spinner's family member "even approached me before." Maybon testified that this interaction occurred prior to the jury verdict, and at the time she texted appellant's counsel to inform him. When asked by the court about the length of the exchange, she initially stated she did not know, estimating "[m]aybe three minutes." When the court noted that "three minutes is a long conversation," Maybon replied: "It may have been just a moment. She walked up, they exchanged some words, and then they walked off." She also told the court that "[i]t wasn't a conversation." Defense counsel noted that at the time, he thought Maybon was referring to the contact in the cafeteria about which the juror had already testified.

Appellant's wife, Patricia Young, testified that she went to the bathroom during a break in trial, and saw two of the victim's family or friends "discussing the case and how they were happy that they finally found out what happened" and that they felt

11

sorry for the victim's mother.  Young stated she believed there were also two jurors in the bathroom at the time.

The court denied the motion.  The court found the conversation relayed by Young to be "pretty innocuous at best. I don't see anything remotely wrong with that. I think there is always some relief when we find out what happened in terms of a loved one, and to make that statement I don't think would have prejudiced anyone one way or the other.  As far as feeling sorry for the mom, I think if it were something more like, you know, we feel sorry for the mom, she's older, the victim was the only one that cared for her. . . .  If they went into details like that and then I can see how the jury would be impacted. But there is always sympathy in a murder case. . . .  And the mere statement of we feel sorry for the mom with nothing more, I don't think it is anything that would impact the jury."

The court also found the testimony regarding the contact at the water fountain was "speculative at best."  The court reasoned, "So on the one hand I was told that it was a three-minute conversation.  On the other hand I was told it was not a conversation.  That words were just exchanged and then – from everything I gathered it was more of a passing thing.  For all I know the person said are you done at the fountain or, you know – and we make comments like that all the time.  Or it may have been excuse me, sorry to bother you.  There was nothing to indicate that it was anything more than perhaps a polite exchange that is common in everyday life.  There was nothing testified to that there was any physical reaction, any facial reaction, any emotional reaction or even extended exchanging of words.  And generally that happens all the time. . . .  So without anything more I don't find that there was good cause . . . to

12

discover the juror information."

B.    *Legal framework*

Under Code of Civil Procedure section 237, any person may petition the trial court for access to personal juror identifying information.  (Code Civ. Proc., § 237, subd. (b).)  Subject to exceptions not applicable here, "[t]he court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information. . . ."  (*Ibid*.)  "Good cause, in the context of a petition for disclosure to support a motion for a new trial based on juror misconduct, requires 'a sufficient showing to support a reasonable belief that jury misconduct occurred. . . .'"  (*People v. Johnson* (2015) 242 Cal.App.4th 1155, 1161–1162 (*Johnson*), quoting *People v. Cook* (2015) 236 Cal.App.4th 341, 345–346.)  The alleged misconduct must be "of such a character as is likely to have influenced the verdict improperly."  (*People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322.)  "Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported."  (*People v. Cook, supra*, 236 Cal.App.4th at p. 346, citing *People v. Wilson* (1996) 43 Cal.App.4th 839, 852.)  Requests for the release of confidential juror records "'should not be used as a "fishing expedition" to search for possible misconduct. . . .'"  (*People v. Avila* (2006) 38 Cal.4th 491, 604.)

If the trial court does set a hearing, it must provide notice to each of the jurors, either by personal service or by mail to his or her last known address.  (Code Civ. Proc., § 237, subd. (c).)  "Any affected former juror may appear in person, in writing, by telephone, or by counsel to protest the granting of the petition."  (*Ibid*.)  "After the hearing, the records shall be made available as

13

requested in the petition, unless a former juror's protest to the granting of the petition is sustained.  The court shall sustain the protest of the former juror if, in the discretion of the court, the petitioner fails to show good cause, the record establishes the presence of a compelling interest against disclosure . . ., or the juror is unwilling to be contacted by the petitioner." (*Id*. subd. (d).)

In *People v. Rhodes* (1989) 212 Cal.App.3d 541 (*Rhodes*) the court set forth a balancing test for considering a defendant's request for disclosure of juror information.[5]  "[T]he *Rhodes* court discerned several policy-based reasons to deny the defendant's request for disclosure of juror identifying information.  These reasons included protecting a juror's state constitutional right to privacy; the possible deterrence of prospective jurors from fulfilling their obligation to serve if they knew they would be subject to postverdict intrusions into their lives; reducing incentives for jury tampering; promoting free and open discussion among jurors in deliberations; and protecting the finality of verdicts." (*Townsel*, *supra*, at p. 1093, citing *Rhodes*, at pp. 548–549.)  The *Rhodes* court concluded that there was "an appropriate middle ground which can harmonize and satisfy [these] competing societal interests" by recognizing a rule that, upon timely motion, counsel for a convicted defendant is entitled to disclosure of juror identifying information "if the defendant sets

---

[5]Although *Rhodes* was decided before the statute's present enactment requiring a showing of good cause, the *Rhodes* test survived the amendments.  (See *People v. Carrasco* (2008) 163 Cal.App.4th 978, 990 (*Carrasco*); *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1095 (*Townsel*); *People v. Wilson* (1996) 43 Cal.App.4th 839, 852.)

forth a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial. . . . [¶] Absent a satisfactory, preliminary showing of possible juror misconduct, the strong public interests in the integrity of our jury system and a juror's right to privacy outweigh the countervailing public interest served by disclosure of the juror information." (*Rhodes*, *supra*, at pp. 551–552; see also *Carrasco, supra,* 163 Cal.App.4th at p. 990.)

We review an order on a motion for disclosure of jurors' identifying information under the deferential abuse of discretion standard. (*Carrasco, supra,* 163 Cal.App.4th at p. 991.)

C.    *Analysis*

Appellant contends he established a preliminary showing of juror misconduct sufficient to require the court to order a hearing and provide notice to the jurors pursuant to Code of Civil Procedure section 237, subdivision (c). We find that the trial court did not abuse its discretion in concluding that appellant failed to make a prima facie showing that juror misconduct occurred.

A defendant accused of a crime has a constitutional right "to be tried by 12, not 11, impartial and unprejudiced jurors." (*People v. Nesler* (1997) 16 Cal.4th 561, 578, citing U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 16; *Irvin v. Dowd* (1961) 366 U.S. 717, 722; *In re Hitchings* (1993) 6 Cal.4th 97, 110.) "'Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors, it is settled that a conviction cannot stand if even a single juror has been improperly influenced.'" (*People v. Nesler, supra*, 16 Cal.4th at p. 578,

15

citations omitted.) "Juror misconduct, such as the receipt of information about a party or the case that was not part of the evidence received at trial, leads to a presumption that the defendant was prejudiced thereby and may establish juror bias. (*Ibid.*, citing *People v. Marshall* (1990) 50 Cal.3d 907, 949–951; *In re Carpenter* (1995) 9 Cal.4th 634, 650–655.)

During trial, the court questioned juror number 6 regarding her contact with Spinner's grandmother in the cafeteria, and questioned juror number 12 regarding his disclosure that he attended high school with appellant. Following those discussions, neither party objected to both jurors remaining on the jury. The trial court found that juror number 6's contact with Spinner's grandmother was brief and unrelated to the case. Appellant provided no evidence to suggest otherwise. Thus, the court was well within its discretion to conclude that this information did not establish good cause for a hearing on juror misconduct.

The only other evidence in support of appellant's petition was the post-trial testimony of appellant's witnesses regarding a second encounter between juror number 6 and an older member of Spinner's family, presumably his grandmother, and a discussion by Spinner's family members in the restroom. The trial court found that Maybon's testimony regarding the encounter at the water fountain suggested it was nothing more than a "passing thing" or a polite exchange. The court relied on Maybon's testimony about the brief nature of the encounter and the lack of reaction by the participants. Based on this evidence, the fact that this was a second contact between Spinner's grandmother and juror number 6 did not, without more, establish a reasonable probability that juror misconduct occurred. We find

16

no abuse of discretion in this conclusion.

We reject appellant's suggestion that Maybon's testimony establishes the possibility that Spinner's grandmother engaged in additional improper contact with jurors. Although Maybon testified that the grandmother approached *her*, she did not identify any other encounters between any members of Spinner's family and any jurors, apart from the incident at the water fountain.

Appellant also argues that the court reached its conclusion by disbelieving Maybon's testimony, thus conducting an improper credibility assessment at the prima facie stage. (See *Johnson*, *supra*, 242 Cal.App.4th at p. 1164, quoting *Spaccia v. Superior Court* (2012) 209 Cal.App.4th 93, 111–112 ["'A "prima facie" showing refers to those facts demonstrated by admissible evidence, which would sustain a favorable decision *if the evidence submitted by the movant is credited*.'"].) Appellant cites the court's finding that the evidence of misconduct was "speculative" as demonstrating such a credibility assessment of the witnesses. We disagree. The court's statement that appellant's evidence was speculative demonstrated a finding that the evidence did not support a showing of good cause. Indeed, the court *credited* Maybon's description of the encounter in determining that there was insufficient evidence to establish anything other than a brief, innocuous incident.

Young's testimony regarding the discussion by Spinner's relatives in the bathroom does not alter this conclusion. The trial court found the evidence innocuous, given that the speakers did not offer details regarding the hardships faced by Spinner's family or other information that might improperly impact a juror, even assuming there was indeed jurors in the bathroom at the

17

time.  On this record, it was not an abuse of discretion for the trial court to conclude that appellant's evidence of juror misconduct was speculative at best, and did not establish good cause for further inquiry.

## II.    Firearm Enhancements

At appellant's sentencing in December 2018, the trial court imposed a consecutive term on count one of 25 years to life for the firearm enhancement pursuant to section 12022.53, subdivision (d).  The court also imposed and stayed firearm enhancement terms of 25 years to life on count two (§12022.53, subd. (d)) and 10 years on count three (§ 12022.5, subd. (a)).  Appellant contends his counsel was ineffective for failing to request at sentencing that the court strike the enhancements in the interest of justice under section 12022.53, subdivision (h).  He also argues that the case should be remanded to allow the court to exercise its discretion to impose an uncharged lesser firearm enhancement.  We are not persuaded by either point.

### A.    *Ineffective assistance principles*

To prevail on a claim of ineffective assistance of counsel, a defendant must establish both that counsel's performance was deficient and that he was prejudiced by the deficient performance.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)  First, to establish deficient performance, a defendant must show that counsel's representation was objectively unreasonable "under prevailing professional norms." (*Id*. at p. 688.)  Second, a defendant can show prejudice where there is "a reasonable probability"—meaning "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id*. at p. 694; see also *People v.*

18

*Goldman* (2014) 225 Cal.App.4th 950, 957.) Unless defendant establishes otherwise, we presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

If the record "'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.'" (*People v. Ledesma* (2006) 39 Cal.4th 641, 745-746.) "Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus." (*People v. Carter*, *supra*, 30 Cal.4th at p. 1211.)

B.     *Analysis*

Effective January 1, 2018, amended sections 12022.5, subdivision (c) and 12022.53, subdivision (h) provide that "[t]he court may, in the interest of justice pursuant to [s]ection 1385 and at the time of sentencing, strike or dismiss an enhancement" otherwise required to be imposed by section 12022.5 or section 12022.53. Thus, at the time of appellant's sentencing in December 2018, the trial court had the discretion to strike the firearm enhancements under sections 12022.5 and 12022.53. Appellant contends that he was denied his right to effective assistance of counsel because his counsel did not request that the court strike the firearm enhancements.

At sentencing, the court stated it was selecting the high term based on the following: "The defendant displayed a good amount of planning and sophistication. It seemed that he was acting in concert with someone else. That they had planned out

19

what was about to occur. It doesn't seem to be a spontaneous act. They went into the location. They seemed to know what they were looking for. They utilized a ruse to get to that safe. And then I also find that there was a good amount of cruelty and a cold, calculated decision to commit this crime. As he was leaving, the door was shut. He was out. I understand the victim may have been chasing him but there was no reason for the defendant to shoot through the door, which ultimately ended up killing the victim." The court also noted appellant's "past criminal history is such that it is increasing in nature."

The record is silent as to appellant's counsel's reasons for failing to request that the court strike one or more firearm enhancements at sentencing. We are not persuaded that there could be no satisfactory reason for counsel's silence, particularly given the evidence cited by the court, which supported the conclusion that appellant planned the robbery, pointed his gun at Spinner while Chase restrained him, and then fired multiple shots through the door at Spinner even though his path to escape was unimpeded.

Moreover, even if appellant's counsel had raised an objection, there is no reasonable probability that the court would have exercised its discretion to strike the firearm enhancements. The court selected the upper term on counts two and three, as well as the high term of 10 years for the firearm enhancement on count three pursuant to section 12022.5, subdivision (a). The court also detailed the bases for its selection of the high term, including that appellant "displayed a good amount of planning and sophistication" in planning the crimes and acting in concert with others; that appellant and the others "utilized a ruse to get to that safe"; that appellant displayed "a good amount of cruelty

20

and a cold, calculated decision to commit this crime," particularly by shooting through the door at the victim when there was "no reason" to do so; and that appellant's "past criminal history is such that it is increasing in nature." Thus, the court's rulings and comments are a clear indication it would not strike the enhancement in any event, and therefore that appellant was not prejudiced by his counsel's failure to seek a reduction of his sentence. (See *People v. Chavez* (2018) 22 Cal.App.5th 663, 713; *People v. Gamble* (2008) 164 Cal.App.4th 891, 901.)

Appellant also suggests that the trial court could have reduced the firearm enhancement to an uncharged lesser included enhancement,[6] citing *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*). We respectfully disagree with the reasoning set forth in that opinion and conclude that the statute does not afford any such discretion.

In *Morrison*, the appellate court construed section 12022.53, subdivision (h) to give a trial court discretion not only to strike an enhancement, but also to "impose an enhancement under section 12022.53, subdivision (b) or (c) as a middle ground" option, notwithstanding a finding by the trier of fact in support of a greater enhancement. (*Morrison, supra*, 34 Cal.App.5th at p. 223.) The court analogized to cases recognizing the trial court's discretionary authority to impose a lesser included, uncharged

---

[6]Section 12022.53 provides three different sentence enhancements for the personal use of a firearm in the commission of enumerated offenses: a 10-year enhancement for the personal use of a firearm (§ 12022.53, subd. (b)); a 20-year enhancement for the personal and intentional discharge of a firearm (§ 12022.53, subd. (c)); and a 25-year-to-life enhancement for the personal and intentional discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)).

21

enhancement where a greater enhancement found true by the trier of fact is determined to be either legally inapplicable or unsupported by sufficient evidence.  (*Id.* at pp. 222-223, citing *People v. Fialho* (2014) 229 Cal.App.4th 1389, 1395–1396 [uncharged firearm enhancement under section 12022.5, subdivision (a) was authorized when defendant was convicted of voluntary manslaughter as a lesser included offense of murder, rendering section 12022.53 enhancement inapplicable]; *People v. Allen* (1985) 165 Cal.App.3d 616, 627 [arming enhancement under section 12022 imposed when section 12022.5 did not apply to conviction]; *People v. Dixon* (2007) 153 Cal.App.4th 985, 1001–1002 [substitution of deadly weapon enhancement under section 12022, subd. (b) for section 12022.53, subd. (b) enhancement, when BB or pellet gun did not qualify as "firearm" under statute].)  The court concluded:  "We see no reason a court could not also impose one of these [lesser] enhancements after striking an enhancement under section 12022.53, subdivision (d), under section 1385."  (*Morrison, supra*, 34 Cal.App.5th at pp. 222-223.)

The reasoning in *Morrison* has been rejected by a number of our sister courts.  (See *People v. Valles* (2020) 49 Cal.App.5th 156, 164, review granted July 22, 2020, S262757; *People v. Yanez* (2020) 44 Cal.App.5th 452, 458, review granted April 22, 2020, S260819; *People v. Garcia* (2020) 46 Cal.App.5th 786, 790-794, review granted June 10, 2020, S261772; *People v. Tirado* (2019) 38 Cal.App.5th 637, 644, review granted Nov. 13, 2019, S257658.)  We agree with the conclusion reached by these courts.  "The express language of sections 1385 and 12022.53, subdivision (h) refers only to dismissing (or striking) actions or enhancements; neither section authorizes the substitution of a lesser enhancement for a greater enhancement, properly found true at

trial, and for which there is no legal impediment to imposition. It does not give the court the right to disregard the verdict of a jury and pronounce a sentence that does not respond to the verdict as rendered." (*People v. Valles, supra*, 49 Cal.App.5th at p. 166.) As such, we conclude that under a plain reading, the Legislature's use of the words "'strike' or 'dismiss' indicates the court's power pursuant to these sections is binary." (See *People v. Tirado, supra*, 38 Cal.App.5th at p. 643.)

Here, the enhancements at issue were neither unsupported by the law nor unsupported by the evidence. Accordingly, remand is unwarranted.

## III. Fines and Fees

Appellant contends the trial court erred by requiring him to pay various fines and fees without finding that he had the ability to pay them. He contends a hearing on his ability to pay was required under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) despite his failure to request such a hearing or otherwise object to any of the fines and fees imposed.[7] We disagree.

At sentencing, the trial court imposed a $10,000 restitution fine (§ 1202.4, subd. (b)), a $10,000 parole revocation fine, stayed (§ 1202.45), a $40 court operations assessment (§ 1465.8, subd. (a)(1)), a $30 criminal conviction assessment (Gov. Code,

---

[7]The California Supreme Court has granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, on the issue of whether a trial court must "consider a defendant's ability to pay before imposing or executing fines, fees, and assessments" and if so, "which party bears the burden of proof regarding the defendant's inability to pay."

23

§ 70373), and $10 crime prevention fee (§ 1202.5).[8]  At the time of sentencing, the statutory minimum fine under section 1202.4 was $200.  Thus, the $10,000 restitution fine the trial court imposed exceeded the statutory minimum.  Even prior to *Dueñas*, section 1202.4 permitted a defendant to present information regarding his or her ability to pay any fine amount above the minimum.  (§ 1202.4, subd. (c).)  Thus, by failing to object to the restitution fine and to present evidence he did not have the ability to pay it, appellant forfeited the argument that the trial court erred in imposing the fine without considering his ability to pay.  (See *People v. Avila* (2009) 46 Cal.4th 680, 729; *People v. Smith* (2020) 46 Cal.App.5th 375, 395; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154.)

With respect to the non-punitive court operations assessment and court construction fees, we note that given appellant's failure to object to the $10,000 restitution fine based on the ability to pay, it is unlikely he would have done so with respect to $80 in assessments.  (See *People v. Frandsen, supra*, 33 Cal.App.5th at p. 1154; accord *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1074; *People v. Gutierrez, supra,* 35 Cal.App.5th at p. 1033.)  Moreover, the imposition of $80 in fees and assessments was harmless given appellant's ability to earn wages during his lengthy prison sentence and his youth at the time of sentencing.  (See *People v. Johnson* (2019) 35 Cal.App.5th 134, 139–140 [any error under *Dueñas* harmless when defendant "will have the ability to earn prison wages over a sustained period"]; *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837

---

[8]We discuss the corrections to these amounts in section IV, *post*.  We have used the corrected amounts here.

[defendant's ability to pay includes the future ability to obtain prison wages and to earn money after release from custody].)

For this reason we also reject appellant's contention that any forfeiture was a result of the ineffective assistance of counsel. Appellant has not shown his counsel had no tactical reason not to object to the assessments, or that he had a reasonable possibility of prevailing by establishing that he was unable to pay the assessments.

## IV.    Correction of Sentencing Errors

Appellant contends the sentencing minute order and abstract of judgment contain several errors that must be corrected.  Respondent agrees.

First, the parties point out discrepancies in the imposition of assessments and fees between the court's oral pronouncement of judgment, the minute order from the hearing, and the abstract of judgment.  In orally pronouncing appellant's sentence, the court imposed one $40 court operations assessment (§ 1465.8, subd. (a)(1)) and one $30 criminal conviction assessment (Gov. Code, § 70373).  However, the minute order and the abstract of judgment reflect three court operations assessments ($120 total) and three criminal conviction assessments ($90 total).  Generally, where there is a discrepancy between the oral pronouncement of judgment and the abstract of judgment or minute order, the oral pronouncement controls, and we may order correction of any such errors.  (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

Second, the court imposed two $10 crime prevention fines (§ 1202.5), one each on counts two and three.  The parties agree that this fine may not be imposed on count two, as attempted robbery is not one of the enumerated offenses under section 1202.5, subdivision (a).  (*People v. Jefferson* (2016) 248

25

Cal.App.4th 660, 663 ["attempted robbery is not among the enumerated offenses for which a local crime prevention programs fine may be imposed"].)  We agree, and order the crime prevention fee imposed on count two stricken.

Finally, the parties agree that appellant should have received 1,457 days of actual custody credit, rather than the 1,455 actual days awarded by the trial court.  We may correct an error in calculating the award of presentence credits at any time. (See *People v. Turrin* (2009) 176 Cal.App.4th 1200, 1205.) Therefore, the judgment is modified to reflect that appellant is to receive presentence credits of 1,457 days of actual custody credit.

## DISPOSITION

We modify the judgment to (1) reflect a $40 court operations assessment (§ 1465.8, subd. (a)(1)) and a $30 criminal conviction assessment (Gov. Code, § 70373) on count one, and a $10 crime prevention fine (§ 1202.5) on count three, and (2) award appellant two additional days of presentence custody credit.  The judgment of the trial court is affirmed in all other respects.  The trial court is directed to prepare an amended abstract of judgment and forward a certified copy to the California Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


WILLHITE, ACTING P.J.                    CURREY, J.


26